UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANDRE PARSONS, Sr.,                                    06-CV-06462-CJS
                                                       DECISION AND ORDER
                              Petitioner,

        -vs-

DALE ARTUS,

                              Respondent.

## INTRODUCTION

Andre Parsons, Sr. ("Parsons" or "Petitioner"), proceeding *pro se*, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his detention in Respondent's custody. Parsons is presently incarcerated pursuant to a judgment entered against him on May 8, 2002, in New York State, Monroe County Court (Geraci, J.), following a jury verdict convicting him of intentional murder and related charges. For the reasons discussed herein, the request for a writ of a habeas corpus is denied.

## BACKGROUND

### I.      Petitioner's Trial

Parsons was indicted by a Monroe County grand jury on four counts related to the on August 13, 2001, shooting death of David Wright ("Wright"), a/k/a, "Devine": second-degree (intentional) murder (N.Y. Penal Law § 125.25(1)); second-degree (depraved indifference) murder (*id.* § 125.25(2)); second-degree criminal possession of a weapon (*id.* § 265.03(2)); and third-degree criminal possession of a weapon (*id.* § 265.02(4)). His

jury trial commenced on April 1, 2002, in Monroe County Court before Judge Geraci ("trial court") and a jury.

### A. The People's Case

#### 1. Eyewitness Lamar Hall

Lamar Hall ("Hall") testified that he was 15 years old in August of 2001 and lived at 26 Fulton Avenue in Rochester. He had been friends with Wright for two to three years. Tr.342–44, 374.[1] Hall acknowledged that he had been selling cocaine for two months on Fulton Avenue with Wright; both of them worked for a man named "L-Bug." Tr.371–72, 374–77, 399–401.

On August 13, 2001, at around 11:00 p.m., Hall, Wright, and a younger boy named Steven were talking together on the porch of a house at 126 Fulton Avenue. T.346–47, 408. Hall saw Parsons, a/k/a, "Dre," across the street at 125 Fulton Avenue. Hall knew Parsons from seeing him around the neighborhood a number of times in the past two months. Tr.344–45, 347, 401–04. At some point, Wright walked across the street to 125 Fulton and engaged in a heated and lengthy argument with Parsons. Tr.347, 351, 409–10, 416–17. Hall testified that Wright and Parsons were "in each other's faces" but not touching; Parsons "kept saying, 'Go home to your mama, go home to your mama.'" Tr.348–49.

Hall walked over and told Wright, "Don't fight. Don't fight," when "all of a sudden" Parsons reached behind his back, pulled out a black semi-automatic handgun and said, "Don't step any closer." Tr.350–51. Hall related that Parsons "cocked" the gun and pointed it at Wright's chest, to which Wright responded, "Yeah, put your gun down. Fight head

---

[1] Citations to "Tr." refer to pages in the trial transcript, which is contained in two volumes of exhibits filed by Respondent, ECF Nos. 44-3 & 44-4.

up," meaning that Wright wanted Parsons to fight with his fists. Tr.350–52, 415, 430–33, 438–39. Hall said he kept pleading with Wright to retreat; finally, Wright walked back across the street with Hall to the nearby intersection of Fulton Avenue and Clarence Park. Tr.351–53, 415, 418–19, 439.

At that point, Hall testified, Parsons jumped off the porch and said, "Say something else about my girl. Say something else about my girl." Tr.353–54, 416-17, 419–21. Hall indicated that Wright turned around and faced Parsons, who fired two shots at Wright. Tr.354, 421. Wright "charged at" Parsons, and they started "grabbing each other." Tr.354, 422–27. Hall testified that Parsons pulled away from Wright, started "swinging the gun," and fired more shots at Wright, who fell to the ground. Tr.354, 427, 429–30.

Hall testified that while Wright was lying in the middle of the road, Parsons "got over" him and fired two more shots. Tr.354-56, 365, 430. Hall stated that one of the bullets hit the ground; he "guessed" that the other bullet "must have hit" Wright, who was "screaming." Tr.356–57. Hall indicated that Parsons "emptied the clip," and the gun "clicked" when he ran out of bullets. Tr.357, 430, 433. According to Hall, Parsons fired about seven shots at Wright. Tr.362.

Hall testified that Parsons ran through the backyard at 124 Fulton, heading towards Lake Avenue. Tr.357, 433.

Hall went over to check on Wright and observed four shells on the ground by Wright's body. Tr.357, 362. He then ran to 126 Fulton where Latacha Harris ("Latacha"), Wright's girlfriend, lived. He asked her to call 911 and went upstairs and got Wright a pillow and a towel. Tr.357–58. Hall stated that the police arrived about five to seven minutes later, and he told them everything he knew. Tr.358, 434.

### 2.  Eyewitness Latacha Harris

Latacha testified that she was 25 years-old, lived in the upstairs apartment at 126 Fulton Avenue, and had known Wright as just a friend for about two and a half months. Tr. 453-55, 466, 490, 499. Latacha testified she also knew Parsons, who was known as "Dre" or "Prince," from seeing him numerous times on Fulton Avenue. Tr.454–55, 479.

Around 11:00 p.m. on August 13, 2001, Latacha related that she was standing by the open window of her upstairs apartment with her sister, Deidre. She admitted consuming about 40 ounces of beer and 12 ounces of Hennessy liquor that evening; she was not "intoxicated" but was experiencing "tipsiness." Tr.455, 479, 483–84, 488–89. Latacha testified she looked across the street to 125 Fulton Avenue and saw Parsons and Wright arguing but could not hear what they were saying. Tr.455–56, 468–69, 484. Latacha said that Parsons was on the porch, Wright was on the sidewalk, and Hall was standing near Wright.  Tr.456, 484.

Latacha recounted that at some point, "Devine [i.e., Wright] was walking away [from Parsons], and as he was walking away, two shots was [sic] fired . . . [b]y Dre [i.e., Parsons]." Tr.457–58, 492–93. Latacha testified that Parsons left the porch and "went after" Wright, who was in the middle of the street; Wright turned around said something as Parsons was walking towards him. Tr.458–59. Latacha related that Parsons grabbed Wright by his white T-shirt and "opened fire on him" with a black-handled handgun. Tr.459. Latacha testified that Wright fell to the ground at the intersection of Clarence Park and Fulton Avenue. Parsons stood over Wright and continued to fire at him but she could not recall how many times. Tr.459–60, 498. After the shooting, Latacha called 911 on her cell

phone. Tr.462, 494–95. She then saw Parsons run through the backyard of 124 Fulton. Tr.462, 495–97.

Latacha testified that she got a pillow and a towel and ran out to assist Wright, propping his head on the pillow and stuffing the wound the towel. Tr.463–64, 494–95. Latacha related that Hall was standing on her porch, crying, when she came downstairs. Tr.464, 498.

On cross-examination, Latacha admitted that she had signed a police statement on August 17, 2001, but denied reading it before signing it, and denied telling the police that she had been sitting on her porch with her sister at the time of the shooting. Rather, she instead claimed that she had told the police that she saw the shooting from the window of her second-floor apartment and that she first noticed this error when she read the police statement while meeting with the prosecutor just before giving her trial testimony. Tr.469–73, 500. Latacha also testified that she recalled appearing before the grand jury, but she did not recall that her grand jury testimony was sworn, and she did not recall testifying that she was on the porch with her sister at the time of the shooting. Tr.473–77, 502.[2]

Latacha also admitted that she had been arrested the previous Friday on a material witness order but had been released after she promised to appear at trial and testify. Tr.465–66. On redirect examination, the prosecutor asked her why she did not testify without a material witness order. Tr.500. She replied, "I was being threatened and–I was

---

[2] On the defense case-in-chief, a stipulation was read to the jury stating that Latacha had testified under oath in the grand jury as follows: "Q. At approximately 11:00 p.m., where were you if you recall? A. I was on my front porch. Q. And who, if anyone else, was in the area around you? A. My sister was on the front porch with me. Devine and the twin [i.e., Hall] was on the sidewalk." Tr.749.

being threatened if I come and testify today that they would kill my kids and me. So, I am afraid to testify." Tr.500–01.

### 3. Eyewitness Anthony Beans

Anthony Beans ("Beans"), a/k/a, "Alabama," testified that he was 38 years-old and lived in an upstairs apartment at 124 Fulton Avenue at the time of the shooting. Tr.505–06, 544–46. Beans testified about his criminal history which included selling cocaine, and he acknowledged his addiction to crack cocaine. Tr.508, 527–47. At the time of trial, he was in jail for a probation violation and was awaiting sentencing on a petit larceny conviction; however, he testified, he did not have any deal with the prosecution in exchange for his testimony against Parsons. Tr.525–26, 539–42, 546–48.

Beans admitted having bought cocaine from Wright, who hung out in front of 126 Fulton, where Latacha and Deidre Harris lived. Tr.545–46, 548–50. He characterized Wright as "like a little brother" to him. Tr.506, 549–50. Beans testified that he knew Parsons and saw him frequently, though they "never really met." Tr.507–08, 557–58.

A little after 11:00 p.m. on August 13, 2001, Beans testified, he was standing in his driveway. He had drunk two or three 12-ounce beers but was not intoxicated. Tr.508, 552–57. Beans recounted watching Parsons and Wright "arguing" on the front porch of 125 Fulton. Tr.509, 511, 556, 558. Beans related that Hall also was in the vicinity. Tr.511, 550, 558–59.

Beans testified that he walked across the street and "told them to stop playing, you know, before it get out of hand, and they kept on, you know, and then it got real serious" when Parsons told Wright, "Don't talk about my family." Tr.509, 511, 559–65.  Beans testified that "Dre pulled out a handgun [and] Wright throwed [sic] his hands up" and

walked away. Tr.511–12, 559, 561, 563. Then, Beans related, Parsons "[r]un behind [Wright] and fired his pistol a couple times" while "pointing it at" Wright, who was about 6 to 8 feet away. Tr.512–13. Beans indicated that Wright "started running" but fell "in the middle of the road as he was hit." Tr.512–13, 561–63. Beans "went in hollering about, 'Stop. You going to kill him. Stop before you kill him,' and the other man, Dre, was standing over him until the pistol started clicking[,]" meaning, "until the pistol emptied." Tr. 513, 522, 564.

Beans testified that he saw Parsons flee toward the back of 124 Fulton; meanwhile, he "tried to comfort" Wright, who was "crying out for his life." Tr.513–14, 565–66. Beans recounted that the ambulance did not arrive until 10 to 15 minutes later. When the police arrived, Beans said, told them everything he had seen and pointed out a bullet hole in the street "half a foot" from where Wright's body had been. Tr.519–21, 566–67.

On the afternoon of August 14, 2001, just before he learned that Wright was dead, Beans recalled he was standing in his driveway with his niece and nephew, when Parsons pulled up in a car with some other men. Tr.523, 568–69. Beans testified that Parsons said to him he had heard that Beans told the police that he (Parsons) had "shot someone over here last night." Tr.523, 569. Beans replied, untruthfully, that he "didn't tell no one nothin'." Tr.523, 569–70. Beans testified that he said this because he was "scared," not for himself, but for his niece and nephew, since Parsons' statement "sounded like" a threat. Tr.570–71. Parsons then instructed Beans to tell people that he "wasn't in the neighborhood last night." Tr.523. Beans indicated that the police did not take his written statement until August 22, 2001, at which time Beans described the substance of this conversation with Parsons. Tr.531–32, 567, 571–72.

### 4.  Eyewitness Crowley Tucker

Crowley Tucker ("Tucker"), a/k/a, "Deek," testified that at the time of the shooting, he was living in an apartment at 116 Fulton Avenue and had known Wright, whom he considered a friend, for about seven months. Tr.582–83, 596–97. Tucker indicated that he also knew Parsons, a/k/a, "Prince," and saw him every day. Tr.583. Tucker acknowledged that he was addicted to crack cocaine, and that he had purchased crack from both Wright and Parsons. Tr.584, 608–09, 612–13. Tucker admitted to a criminal history that included criminal trespass and criminal contempt for violating an order of protection against a girlfriend. Tr.589–95. Tucker also acknowledged that he had in the past worked as a confidential informant with the Rochester Police Department ("RPD"), making undercover purchases of drugs. Tr.595–600. He testified that, at the time of the trial, he was not engaged as a confidential informant.

On August 13, 2001, a little after 11:00 p.m., Tucker recounted that he was in front of his house at 116 Fulton when he noticed Parsons and Wright arguing. Tr.584-85, 609. According to Tucker, "words were exchanged" and they "confronted each other" but Hall and Beans intervened before the fight turned physical. Tr.585–86. Tucker watched as Wright "went to walk away" but Parsons pulled out a .45 caliber handgun and "fired at [Wright] twice, missing." Tr.586. At that point, Tucker fled to the rear of his house.  As he ran, he heard "at least" five more shots. Tr.586–87.

When Tucker returned, he saw Wright lying in the street, holding his abdominal area. Tr.586–87. Tucker saw Parsons flee through the backyard of 124 Fulton, toward Lake Avenue. Tr.587. Tucker admitted having smoked crack at around 9:00 a.m. and

8:30 p.m. that day, but he insisted that his faculties were not impaired at the time of the shooting. Tr.602–12.

### 5. Wright's Identification of Parsons

At about 11:20 p.m. on the night of the shooting, RPD Officers Timothy Pearce ("Officer Pearce") and Adam Correia ("Officer Correia") responded to a 911 call regarding a shooting on Fulton Avenue. Tr.613–15, 654–46. The two officers testified they arrived about two minutes later before any other police or emergency personnel. Tr.613–15, 645-47, 657. They related that they found Wright, surrounded by four or five people, lying on his back in the middle of the road in front of 124 Fulton Avenue, near the corner of Fulton Avenue and Clarence Park, with gunshot wounds to the abdomen and left arm. Tr.615, 617, 619, 647, 652, 656.

Officer Correia recounted that Wright was curled up in a fetal position, "moaning and groaning," and appeared to be in "agony." Officer Correia testified that he asked Wright for his "pedigree information" and also asked, "Who did this to you," but Wright gave "no response," and "just . . . continued to moan and groan," "almost . . . yelling." Tr.647–48, 658, 662–63, 667. Wright finally identified himself. Tr.649.

About 30 seconds after Officers Correia Pearce arrived, the fire department and the paramedics arrived and immediately began working on Wright. Tr.649, 657–61. Officer Correia testified that Wright did not stop moaning and gave a "shout of pain" each time the ambulance team moved him. Tr.650, 661. Officer Correia related that just as Wright "was being placed on the gurney," which was within, "at most," two minutes after the police arrived, he asked Wright, "Who had did [sic] this to you?" Tr.649–50, 663. Officer Correia testified that Wright responded, "'Andre Parsons

shot me.'" Tr.650–51, 663. Officer Correia indicated that he did not take notes of this exchange. Tr.665.

### 6. Physical Evidence Recovered at the Crime Scene

At the scene of the shooting, Officer Pearce spoke to Beans who was "reluctant" but provided information Tr.616. RPD Investigator David Mace ("Investigator Mace") interviewed Tucker, whom he described as coherent, responsive, and not intoxicated. Tr.625–26.

RPD technician Gary Stenclik ("Stenclik") testified about the recovery of five bullet casings and several copper bullet jacket fragments and lead fragments. Tr.698–99. Firearms examiner John Clark ("Clark")  testified that all of the casings and bullet jackets were fired from the same .45 caliber gun. Tr.719, 723–29.

Stenclik testified that his camera malfunctioned, so the photographs he had taken that night could not be developed; therefore, there were no photographs of where the casings were recovered. Tr.703–04. It was unclear from the testimony where exactly the casings, jacket fragments, and bullet fragments were recovered, though according to Officer Correia and Stenclik, at least one casing was found about one foot from Wright's body. Tr.649, 651–52, 690–92. Investigator Mace, Officers Correia, and Stenclik indicated that other casings and fragments were found elsewhere on Fulton Avenue towards the curb near Clarence Park and in an open field nearby. Tr.621–24, 652–53, 690–92. According to Investigator Mace, Officers Correia, and Stenclik, there appeared to be a bullet strike in the street within one foot of Wright's body, consistent with a high caliber gunshot fired at close range. Tr.624–25, 654–55, 690–92, 709–10.

### 7. The Autopsy Results

Dr. Nicholas Forbes, Monroe County Chief Medical Examiner, performed the autopsy, but Deputy Medical Examiner, Dr. Thomas Smith, testified regarding the autopsy report because Dr. Forbes was out of the country at the time of trial. Tr.735, 737–38. Dr. Smith testified that Wright sustained two gunshot wounds; one was a "relatively minor" "through and through" wound in left elbow region, while the other was a "through and through" wound to the abdomen which caused Wright's death. Tr.739–42. Dr. Smith explained that the bullet that caused the abdominal wound entered Wright's back just to the right of the midline of the back near the lowest rib, traveled forward and upward in the body and a little to the right so that it exited the front of the body somewhat higher than the entrance wound. *Id.*

Dr. Smith indicated that no gunshot residue was found on Wright's skin during the autopsy, but he explained that a shot from a .45 caliber gun from four feet away would not necessarily leave residue. Tr.742–46. Dr. Smith stated that Dr. Forbes had not been provided with the t-shirt worn by Wright, which might have revealed gunshot residue. *Id.*

### B. The Defense Case

The defense called two alibi witnesses, Aubrey Gollogly ("Gollogly") and Carol Langen ("Langen"). On August 13, 2001, Gollogly lived with his girlfriend, Langen, at 70 Lake View Park in Rochester, where Gollogly acted as the building superintendent. He and Langen testified that they knew Parsons and his girlfriend, who lived two doors down from their apartment. Tr.749–54, 772–74. Gollogly testified that he worked as a school crossing guard and at a pharmacy; he also admitted to a criminal history that included cocaine possession and various crimes involving intoxication and violence. Tr.760–70.

Gollogly testified that at 10:05 p.m. on the night of August 13, 2001, he and Langen were at home watching television when the lobby buzzer rang. Tr.755–56, 762, 771. Their apartment was the first door on the left after the lobby. Tr.752–53. Upon hearing the buzzer, Gollogly testified that Langen went to the lobby and opened the security door. Gollogly indicated that he heard Langen talking to someone and then saw Parsons walking past. Tr.755–56, 771–75. Gollogly testified that he said "Hey, Dre," and Parsons responded, "What's up." Tr.755, 771–72. Gollogly and Langen testified that she came back inside but left the apartment door open slightly because, among other reasons, it was hot out. Tr.756, 774.

Gollogly testified that he watched a little bit of television and then went to bed because he had to get up for work the next morning. Tr.757.

Langen testified that at around midnight, she had the front door of the apartment open and was sitting in the living room when Parsons "walked back down the hall and left the building." Tr.774–75. According to Langen, Gollogly was with her at around midnight when she saw Parsons leave the apartment building. Tr.776. However, Langen was unable to identify Parsons in the courtroom. *Id.*

On cross-examination, Gollogly acknowledged that when the police interviewed him after Parsons was arrested, he did not tell the officers about Parsons having walked by his apartment on the night of the shooting. Tr.758-59. Instead, Gollogly told the police that he was unsure if Parsons was at home that night. *Id.*

Langen testified on cross-examination that she provided a statement to the police on August 14, 2001. According to Langen, she did not merely tell the police that she had seen Parsons at 10:00 p.m., but that she had seen Parsons "after midnight." Tr.777–78.

The defense also called paramedic Lashay Harris ("Lashay") to rebut Officer Correia's testimony about Wright's identification of Parsons. *Id.* Lashay testified that on the night of the shooting, she arrived at the scene in an ambulance with other paramedics; she found fire department personnel already providing medical care to Wright, who was lying in the middle of the street. Tr.780, 782. With the assistance of several other of the first responders, Lashay strapped Wright to a backboard, loaded him into the ambulance, and brought him to the hospital.

Lashay testified Wright complained of "a lot of pain in his abdomen area" but she never heard him say, "Andre Parsons shot me." Tr.780–83. Lashay explained that if she had heard such a statement, she would have been required to inform a police officer and to document the statement in her paperwork. Tr.783. Lashay acknowledged on cross-examination that "there was police everywhere" on the scene and said "[t]hey may have been talking to the patient prior to us getting our equipment out" or before the ambulance arrived; she did not really know. Tr.784–85.

### C. The Verdict and Sentence

On April 5, 2002, the jury returned a verdict finding Parsons guilty as charged in the indictment. Tr.882–85. On May 8, 2002, the trial court imposed an indeterminate sentence of 25 years to life in prison on the intentional murder conviction along with concurrent determinate terms of 15 years' and 7 years' imprisonment on the second-degree and third-degree weapon possession counts, respectively. Tr., May 8, 2002, at 16–17 (ECF No. 44-4).

## II.     Direct Appeal

Represented by new counsel, Parsons appealed to the Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division"). In addition to the brief filed by appellate counsel, SR.130–191,[3] Parsons filed a *pro se* supplemental appellate brief, SR.239–87. On December 30, 2004, the Appellate Division unanimously affirmed the conviction. *People v. Parsons*, 13 A.D.3d 1099 (4th Dep't 2004). On February 28, 2005, the New York Court of Appeals ("Court of Appeals") denied leave to appeal. *People v. Parsons*, 4 N.Y.3d 801 (2005). On April 30, 2005, that court denied Parsons' *pro se* motion for reconsideration. *People v. Parsons*, 4 N.Y.3d 855 (2005).

## III.     Post-Conviction Proceedings

On October 5, 2005, Parsons filed a *pro se coram nobis* motion challenging appellate counsel's effectiveness, SR.405–42. Relief was summarily denied by the Appellate Division, and the Court of Appeals denied leave to appeal. SR.459, 468.

On January 20, 2009, Parsons then filed a *pro se* motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 ("440.10 motion"), citing C.P.L. § 440.10(1)(c) ("[m]aterial evidence adduced at a trial resulting in the judgment was false and was, prior to the entry of the judgment, known by the prosecutor or by the court to be false") and (h) ("judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States"). SR.469–82. In support of the 440.10 motion, Parsons submitted two affidavits signed by Hall averring that he perjured himself before the grand jury and at trial, and that the prosecutor knew of his false testimony. The trial court denied the motion without a hearing, finding Hall's

---

[3] Citations to "SR." refer to the Bates-stamped pages of the state court record, filed by Respondent, ECF No. 44-2.

14

recantation to be incredible. SR.502–09. Parsons appealed, and the Appellate Division, on February 7, 2014, remitted the case to the trial court for an evidentiary hearing. *People v. Parsons*, 114 A.D.3d 1154, 1154 (4th Dep't 2014). The Appellate Division found that the People had "submitted nothing in opposition to the motion that would require or indeed allow the [trial] court to deny the motion without a hearing." *Id.*

On remand, the matter was handled by Monroe County Court Judge James J. Piampiano ("440.10 court"), who appointed new counsel for Parsons and held a hearing on November 7, 2014. The hearing testimony and Hall's affidavits are discussed in greater detail in the Court's discussion, *infra*, of Parsons' habeas claims based on Hall's alleged perjury. Following the hearing, the 440.10 court denied the motion on February 11, 2015, in a written decision and order, SR.775-88, and in an oral ruling, SR.789–809.

Represented by different counsel, Parsons filed an appellate brief in the Appellate Division. SR.813–52. On February 1, 2019, the Appellate Division affirmed the denial of the 440.10 motion. SR.957–58. The Court of Appeals denied leave to appeal on April 15, 2019. SR.963.

## IV.    The Federal Habeas Proceeding

On September 13, 2006, Parsons commenced this habeas proceeding by filing a *pro se* Petition. ECF No. 1. On June 17, 2009, he sought permission to file an amended petition and to have his petition held in abeyance while he pursued exhaustion of the claims raised in his 440.10 motion. ECF No. 17. The Court (Larimer, D.J.) granted the motion to amend and denied the motion to stay without prejudice on August 19, 2009, ECF No. 18. Parsons filed his Amended Petition on October 8, 2009. ECF No. 23.

On February 4, 2011, the Court (Telesca, D.J.) granted the motion to stay pending Parsons' completion of exhaustion proceedings with regard to his 440.10 motion. ECF No. 29. Upon receiving notice from Parsons, Judge Telesca lifted the stay on June 11, 2019, and directed Respondent to answer the Amended Petition. ECF No. 36.

Respondent filed a Memorandum of Law in Opposition, ECF No. 43. Respondent also filed an Answer, ECF No. 44, and several volumes of exhibits, ECF No. 44-1 (State Record Table of Contents); ECF No. 44-2 (State Record); ECF No. 44-3 (State Court Transcript, Volume 1 of 2; and ECF No. 44-4 (State Court Transcript, Volume 2 of 2). Parsons did not file a reply.

The Amended Petition ("Pet."), ECF No. 23, raises the following grounds and subgrounds for relief:

- The prosecutor committed misconduct in the grand jury (Grounds 1(A), (B), and (C));
- The prosecutor failed to disclose exculpatory evidence of Hall's grand jury perjury in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and suborned perjury at trial from Hall (Ground 1(D));
- Petitioner's Sixth Amendment right of confrontation was denied based the trial court's failure to reopen Hall's cross-examination after defense counsel's receipt of Hall's Family Court juvenile delinquency records (Ground 1(E));
- The prosecutor failed to disclose exculpatory evidence of Hall's Family Court juvenile delinquency records (Ground 1(F));
- The prosecutor committed misconduct during opening statements by referring to evidence that was never elicited; referencing Petitioner's prior drug-selling activity in violation of the trial court's pre-trial ruling; eliciting testimony that Latacha was threatened; made prejudicial statements to prospective juror McGlynn during *voir dire*; and made prejudicial comments on summation (Ground 1(G));
- The prosecutor orchestrated a prejudicial news broadcast in order deny Petitioner a fair trial (Ground 1(H));
- An attorney who represented Petitioner prior to trial was ineffective for failing to protect his right to testify in the grand jury (Ground 2);
- Trial counsel was ineffective because he declined to subpoena certain police officers to testify about a report containing evidence supportive of Petitioner's alibi defense; declined to call Petitioner's grandmother to testify in support of his alibi; failed to move to exclude prospective juror McGlynn; failed to object

16

to the admission of photographs of the crime scene and the bloody t-shirt worn by the victim;  failed to investigate the crime scene for "inconsistencies"; failed to confront Hall with a police report in which Hall said that Petitioner had a tattoo he allegedly does not have; and made prejudicial comments on summation (Ground 3);

- The prosecutor exercised race-based peremptory strikes in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986) (Ground 4);
- Petitioner was denied his right to be present at sidebar conferences during jury selection (Ground 5);
- The verdict is not supported by legally sufficient evidence because it is based on incredible, false, and inconsistent testimony (Ground 6);
- The trial court erred in allowing Latacha to testify about death threats she received (Ground 7);
- The trial court erred in admitting Officer Correia's testimony about the victim's excited utterance identifying Petitioner (Ground 8);
- An attorney who represented Petitioner prior to trial had a conflict of interest (Ground 9);
- Appellate counsel on direct appeal was ineffective for failing to argue that trial counsel was ineffective for failing to move to exclude Juror Heath for cause; that the trial court erred in failing to grant Petitioner's mistrial motion based on the victim's mother's courtroom outburst; and that the Monroe County Public Defender's Office had a conflict of interest due to its prior representation of the victim's family member (Ground 10).

Respondent has raised the defenses of non-exhaustion and procedural default with regard to a number of the grounds and subgrounds and has further argued that, in any event, the claims are all without merit or are not cognizable on federal habeas review. Parsons has not responded to Respondent's exhaustion and procedural default arguments.

## EXHAUSTION OF STATE REMEDIES

### I.    General Legal Principles

"Before a federal court may grant habeas relief to a prisoner in state custody, the prisoner must exhaust his or her state court remedies." *Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); 28 U.S.C. § 2254(b)(3), (c)). In general, the exhaustion requirement is satisfied "when a petitioner has:

(i) presented the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim." *Ramirez v. Att'y Gen. of State of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001) (citing *Picard v. Connor*, 404 U.S. 270, 276–77 (1971); other citation omitted).

"In New York, to invoke 'one complete round of the State's established appellate review process,'" *Galdamez*, 394 F.3d at 74 (quoting *O'Sullivan*, 526 U.S. at 845), "a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Id.* (citing N.Y. Crim. Proc. Law § 460.20 (McKinney 1994); other citation omitted). The leave application may be in letter form, *id.* (citing New York Court Rules § 500.10(a) (McKinney 1999)), and must be accompanied by appellate briefs and other documents from the lower courts.

The Supreme Court has explained that "[i]f state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must . . . be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995). A habeas petitioner need not cite "book and verse" of the Constitution, *Picard*, 404 U.S. at 278, "but adequate notice to the state courts that they are to decide federal constitutional claims at least includes: '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional

litigation.'" *Petrucelli v. Coombe*, 735 F.2d 684, 687–88 (2d Cir. 1984) (quoting *Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 194 (2d Cir.1982) (*en banc*)).

## II.    Analysis

Respondent argues that a number of Parsons' claims are unexhausted for a variety of reasons. Respondent contends that Grounds 1(A), 1(B), and 1(C); the portion of Ground 1(D) alleging prosecutorial misconduct based on the subornation of perjury rom Hall; Grounds 1(E), 1(F), 1(G), and 1(H); and Grounds 3, 5, 7, 8, and 9 were not presented to the New York state courts for one complete round of appellate review on direct appeal or in appeal of the denial of the 440.10 motion after the evidentiary hearing. *See* Respondent's Memorandum of Law in Opposition ("Resp. Mem.") (ECF No. 43) at 30–31 (the portion of Ground 1(D) asserting prosecutorial misconduct based on subornation of perjury); *id.* at 31–32 (Grounds 1(E) and 1(F)); *id.* at 43 (Ground 1(H)); *id.* at 45 (Ground 1(G)); *id.* at 56–57 (Ground 3); *id.* at 73–74 (Ground 5); *id.* at 78–79 (Ground 7); *id.* at 81–82 (Ground 8); *id.* at 89-90 (Ground 9). According to Respondent, these claims must be deemed exhausted but procedurally defaulted because Parsons has no longer has any state court remedies available to him. *See id.*

With regard to Ground 1(D), Respondent argues in the alternative that to the extent the Court finds that Parsons could return to state court to exhaust it, the Court nevertheless should dismiss it pursuant to 28 U.S.C. § 2254(b)(2) because it is plainly meritless. *See* Resp. Mem. at 31.

Respondent also contends that most of the subgrounds of ineffective assistance of trial counsel raised in support of Ground 3 were not presented to the Appellate Division at all.  *See* Resp. Mem. at 56, 60–63. Respondent further argues that Grounds 1(A), 1(B),

1(C), 5, 7, and 8 were not properly exhausted because, in addition to not being referenced in the application for leave to appeal, they were not raised in federal constitutional terms. *See* Resp. Mem. at 73–74; 78–79;  81–82.

### A. Grounds 1(E) and 1(F), Parts of Ground 1(G), Ground 1(H), Parts of Ground 3, and Ground 9 Are Exhausted Because They Were Fairly Presented on Direct Appeal

In his *pro se* supplemental appellate brief, Parsons asserted, *inter alia*, the following claims: the trial court violated the Sixth Amendment's Confrontation Clause by refusing to reopen cross-examination when additional evidence of Hall's juvenile delinquency record in Family Court came to light, SR.248–51, Pet., Ground 1(E); the prosecutor violated his obligations under *Brady* by withholding Hall's Family Court records, SR.252–55, Pet., Ground 1(F); the prosecutor committed misconduct in his opening statement, SR.256–57, Pet. at 22–23, Ground 1(G); the prosecutor committed misconduct by referring to Parsons' prior drug-selling activities, SR.258, Pet. at 23, Ground 1(G); the prosecutor orchestrated a prejudicial cable news broadcast just prior to trial in which the victim's mother accused Parsons of an uncharged homicide, SR.284– 86, Pet., Ground 1(H); trial counsel was ineffective because he failed to object to a bloody t-shirt that was taken into the jury room, failed to object to admission of surgery photographs of the victim, failed to object to the admission of crime scene photographs taken three days after the incident, failed to cross-examine Hall about his prior statement that Parsons has a tattoo which he does not actually have, and failed to introduce an allegedly exculpatory police report that would support his alibi defense, SR.260–61, Pet.,

Ground 3;[4] and pre-trial counsel had a conflict of interest due to his subsequent representation of a prosecution witness, SR.263–64, Pet., Ground 9.

Respondent asserts that all of these claims are unexhausted because they were not mentioned in appellate counsel's application for leave to appeal ("Leave Letter") to the Court of Appeals. Respondent contends that the Leave Letter, although expressly raising the *Batson* claim and the claim that Parsons was denied the right to testify in the grand jury, referred to the other claims in the counseled appellate brief and his *pro se* supplemental appellate brief only in passing. *E.g.*, Resp. Mem. at 21 (citing SR.316–20). Therefore, Respondent argues, Parsons did not fairly present them to the Court of Appeals. *Id.*

The relevant portions of the Leave Letter are as follows. First, at the beginning of the letter, appellate counsel "request[ed] that leave be granted to address a novel issue: what are the obligations of a trial court when a defense attorney argues in opposition to a defendant's allegation that he was deprived of his right to testify in the grand jury[.]" SR.316. At the close of the letter, appellate counsel stated that "[a]ppellant also respectfully requests that leave be granted so that this Court may review the issues raised *both in his main brief and in Appellant's* pro se *brief.*" SR.319 (emphasis supplied). Finally, appellate counsel stated that "[a]dditionally, pursuant to *O'Sullivan v. Boerckel*, 516 US 838 (1999), appellant expressly urges that leave to appeal be granted to review the following issues: Did the prosecutor impermissibly use a peremptory challenge to strike

---

[4] Some arguments supporting the ineffective assistance of trial counsel claim that Parsons raised in the *pro se* supplemental appellate brief are not raised in the Amended Petition, namely, that trial counsel failed to object to the admission of surgery photographs of the victim, failed to cross-examine Hall about his statement that Parsons fired his gun until it began clicking because an automatic weapon does not click once the clip is empty, failed to challenge Beans' testimony that Parsons told him the victim had died, and failed to challenge the testimony from "witnesses" that the victim was shot in the stomach at close range which was "conclusively contradicted by the ballistics and medical reports." SR.260.

a prospective juror on the basis of that juror's race in violation of *Batson v. Kentucky* (476 U.S. 79 [1986]." SR.320 (case citations as in original).

The Second Circuit has issued several cases addressing leave applications and discussing what type of language is and is not sufficient to "fairly apprise" the Court of Appeals that review of a claim is sought by the habeas petitioner. Respondent argues that this case is governed by *Jordan v. Lefevre*, 206 F.3d 196 (2d Cir. 2000), in which the petitioner submitted a letter in support of his application for leave to appeal which highlighted one issue and concluded by asking permission to appeal "'[f]or all of these reasons and the reasons set forth in his Appellate Division briefs.'" *Id.* at 198 (quotation to record omitted). The Second Circuit held that "[a]rguing a single claim at length and making only passing reference to possible other claims to be found in the attached briefs does not fairly apprise the state court of those remaining claims." *Id.* at 198–99. The Second Circuit later observed that the concluding language of the letter in *Jordan* "might as easily have been a reference to additional reasons for reviewing the [highlighted] claim as an incorporation of other, different claims asserted in the lower court." *Galdamez*, 394 F.3d  at 75 (quoting *Ramirez*, 280 F.3d at 97).

The Court disagrees and finds that this case is more similar to *Morgan v. Bennett*, 204 F.3d 360 (2d Cir. 2000). There, the petitioner submitted two letters seeking leave to appeal. The first was a general letter "request[ing] th[e] Court [of Appeals] to *consider and review all issues outlined in defendant-appellant's brief and* pro se *supplemental brief.*" *Id.* at 369–70 (quotation to record omitted; emphasis in original). The petitioner in *Morgan* subsequently supplemented the first letter with a second letter "draw[ing] [the court's] attention" to a particular issue in the *pro se* brief. *Id.* at 370 (quotation to record omitted).

The Second Circuit determined that all of the petitioner's claims had been exhausted, not just the one on which the petitioner focused in the second letter. *Id.* at 371. The first letter was "sufficiently specific to alert the Court of Appeals that [the petitioner] sought review of all of the issues raised in his [appellate briefs]," and the second letter could not be construed as "eliminating issues as to which review had been expressly requested" in the first letter. *Id.* at 371.

Unlike in *Jordan*, appellate counsel here did not request review "for all of these reasons and the reasons set forth in [the] Appellate Division briefs," but instead specifically requested "review *of the issues* raised both in his main brief and in Appellant's *pro se* brief." SR.319 (emphasis supplied). *See Michaels v. Portuando*, No. 99-CV-3195(JG), 2002 WL 1732813, at *10 (E.D.N.Y. July 23, 2002) (finding that petitioner's leave letter was sufficient to fairly present all six of his claims, where appellate counsel "spell[ed] out . . . three claims" and stated that petitioner "put forth several more issues in his *pro se* supplemental brief which is also enclosed herewith *for the court's consideration*"; stating that "although *Morgan*'s request is more direct than that of Michaels, . . . the gist of each letter—that the Court consider all of the claims raised in the briefs—[is] identical") (citation omitted; emphasis in original); *Gajadhar v. Ercole*, No. 09-CV-1964, 2010 WL 3036498, at *3 (S.D.N.Y. Aug. 4, 2010) (holding that a petitioner exhausted his claims contained in an appended brief where his leave application focused on one issue but a footnote in his application explicitly stated that the petitioner sought leave to appeal the issues raised in the appended briefs and then specifically identified all of the issues raised in the briefs); *Delucia v. West*, No. 04 CIV. 3605 (DC), 2005 WL 1981708, at *5 (S.D.N.Y. Aug. 17, 2005) (Chin, D.J.) (appellate counsel "provided detailed

argument regarding only one of [petitioner's] claims" and stated in the leave letter's last paragraph, "[f]or all of these reasons, as well as those cited in appellant's main brief, he respectfully requests leave to appeal to the Court of Appeals"; case differed from *Jordan* because in the first paragraph, counsel referred to issue discussed as "primary issue urged for appeal" which "should have alerted the Court of Appeals to other issues, aside from the primary issue discussed in the letter application, that required consideration").

Therefore, the Court finds that Grounds 1(E) and 1(F), Parts of Ground 1(G), Ground 1(H), Parts of Ground 3, and Ground 9 were fairly presented to the state courts for one complete round of appellate review and are exhausted.

### B. Grounds 1(A), 1(B), and 1(C); Part of Ground 1(H), Part of Ground 3, and Grounds 5, 7, and 8 Were Not Fairly Presented on Direct Appeal

#### 1. Grounds 1(A), 1(B), and 1(C)

Grounds 1(A), 1(B), and 1(C) assert that the prosecutor engaged in misconduct during the grand jury proceeding by interfering with Parsons' right to testify (Ground 1(A)); intentionally suborning perjury from a witness (Ground 1(B)); and withholding exculpatory evidence in the form of a police report that would have proven his alibi (Ground 1(C)). Respondent argues that Parsons' *pro se* supplemental brief, liberally construed, raised Ground 1(A) but did not do so in federal constitutional terms. *See* Resp. Mem. at 20–21 (citing SR.279–80). Respondent further contends that Parsons did not raise the factual or legal bases for Grounds 1(B) or 1(C) in his *pro se* supplemental appellate brief at all. *See id.* (citing SR.279–80).

The Court agrees. Parsons asserted only facts suggesting that the prosecutor interfered with his right to testify, the claim asserted in Ground 1(A). According to Parsons, the prosecutor, although allegedly being aware of Parsons' desire to appear before the

grand jury, did not argue on Parsons' behalf when the trial judge allegedly "disregarded [his] attempt to verify that he requested to appear before the grand jury." SR.279 (citing *People v. Gini*, 72 A.D.2d 752, 753, 421 N.Y.S.2d 269 (2d Dep't 1979) (discussing error under N.Y. Crim. Proc. Law § 190.50 (5)(a)). However, Parsons only cited state law cases that applied state statutory law. *See id.* Indeed, "there is no federal constitutional right to a grand jury in a state criminal proceeding. The right to a grand jury is a matter of New York State law and as such is not reviewable on a petition for habeas corpus." *Mirrer v. Smyley*, 703 F. Supp. 10, 11–12 (S.D.N.Y.1989), *aff'd*, 876 F.2d 890 (2d Cir. 1989); footnote omitted). Ground 1(A) therefore was not fairly presented in federal constitutional terms and is unexhausted..

As to Grounds 1(B) and 1(C), Parsons did not mention any facts in support of his claims of alleged subornation of perjury and withholding of exculpatory evidence by the prosecutor in the grand jury proceeding. *See* SR.279-80. Those claims also are unexhausted because the Appellate Division was not put on notice of their factual or legal bases.

### 2.  Ground 5

The Court turns next to Ground 5, which asserts that Parsons was denied his right to be present at sidebars during jury selection. "A criminal defendant has a federal constitutional right, under the Confrontation Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments, '"to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings."'" *Sanchez v. Duncan*, 282 F.3d 78, 81 (2d Cir. 2002) (quoting *Tankleff v. Senkowski*, 135 F.3d 235, 246 (2d Cir. 1998) (quoting *Faretta v. California*, 422 U.S. 806, 819-20 n. 15  (1975)). "It

is well-established that the impaneling of the jury is one such stage." *Tankleff*, 135 F.3d at 246; *accord Sanchez*, 282 F.3d at 82 (noting that government argued that denial of right to be present at jury selection sidebars was based solely on New York statutory provision and therefore not cognizable but instead affirming denial of habeas relief because any error was harmless); *but see*, *e.g.*, *James v. Senkowski*, No. 97 Civ. 3327(DCL), 1998 WL 217903, at *8 (S.D.N.Y. Apr. 29, 1998) (dismissing as non-cognizable petitioner's claim based on the denial of right to be present at a sidebar during jury selection; stating that "[t]here is not now and never has been a right guaranteed in the federal Constitution that a defendant be present at sidebar *voir dire*.") (citation omitted).

Assuming that Parsons' absence from jury selection sidebars could state a federal constitutional claim, appellate counsel did not fairly present such a claim on direct appeal. Appellate counsel relied exclusively on New York state cases and statutory law embodying a defendant's "fundamental statutory right to be present at all material stages of his trial." SR.165 (quoting *People v. Lucious*, 269 A.D.2d 766, 767 (4th Dep't 2000); N.Y. Crim. Proc. Law § 260.20). The Court of Appeals consistently has held that a defendant's right to be present at *voir dire* sidebars is conferred solely by statute, and not by the federal or state Constitutions. *E.g.*, *People v. Sprowal*, 84 N.Y.2d 113, 117 (1994). Given that New York's highest court views the right in question to be purely a creature of statute, the Appellate Division would not have been put on notice that Parsons was raising a constitutional claim since his brief only cited to state cases interpreting state statutory law. Accordingly, the Court finds that the jury sidebar claim is unexhausted.

### 3. Grounds 7 and 8

Finally, the Court considers Grounds 7 and 8, which are based on allegedly erroneous evidentiary rulings. Ground 7 alleges that Latacha should not have been permitted to testify on redirect examination about death threats she received. Ground 8 asserts that the trial court erred in allowing Officer Correia to testify about the victim's identification of Parsons pursuant to the excited utterance hearsay exception.

The Supreme Court has explained that "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." *Duncan*, 513 U.S. at 366 (citing *Anderson v. Harless*, 459 U.S. 4 (1982)). With regard to Ground 7, appellate counsel asserted the factual basis for the claim in the appellate brief, but solely argued that the trial court misapplied state evidentiary law. *See* SR.181–85 (arguing that the trial court erred in finding that defense counsel "opened the door" and abused its discretion in permitting re-direct examination of Latacha Harris about the death threats she received because the testimony was so prejudicial). This was insufficient to place the state courts on notice of a federal constitutional claim based on the erroneous introduction of evidence. *See Duncan*, 513 U.S. at 365–66 (finding that habeas petitioner failed to exhaust his claim that state trial court's evidentiary ruling denied him due process of law guaranteed by the Fourteenth Amendment where he argued in state court that, as a matter of state law, the prejudicial effect of evidence outweighed its probative value).

Ground 8 was raised by Parsons in his *pro se* supplemental appellate brief, again as an error of state evidentiary law. *See* SR.265-66 (citing state law cases regarding the

admission of excited utterances as an exception to the hearsay rule). At the end of his argument on this point, Parsons stated that "such prejudicial testimony and the contradiction of such [sic] this violated [his] 6th and 14th amendment [rights] to a fair and impartial trial." SR.266. However, "[a]lleging lack of a fair trial does not convert every complaint about evidence or a prosecutor's summation into a federal due process claim." *Daye*, 696 F.2d at 193 (quoting *Kirksey v. Jones*, 673 F.2d 58, 60 (2d Cir. 1982)). Parsons' mention of two amendments relevant to a defendant's trial rights was inadequate to fairly present his evidentiary claim in federal constitutional terms. *See  Petrucelli*, 735 F.2d at 688 (appellate counsel's contention that the introduction of certain evidence "deprived [the petitioner] of fair trial [sic] and due process of law" did not fairly present claim in federal constitutional terms) (citations omitted). Accordingly, the Court finds that Grounds 7 and 8 are unexhausted.

### 4. The Factual Bases for Parts of Ground 1(G) and Ground 3 Were Not Presented on Direct Appeal

#### a. Parts of Ground 1(G)

There are certain instances of alleged misconduct alleged in Ground 1(G) that were not presented for review in state court. In particular, Parsons did not assert that the prosecutor committed misconduct by questioning Latacha on redirect examination about her receipt of death threats, Pet. at 23; or that the prosecutor informed prospective juror McGlynn that the case involved a confidential informant who had recovered the murder weapon, *id.* at 24. Because the state courts never had the opportunity to rule on these claims, they are unexhausted. *See Daye*, 696 F.2d at 191–92 ("Specifically, [a habeas petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not

had a fair opportunity to rule on the claim.") (citing *Picard*, 404 U.S. at 276; other citations omitted).

### b.  Parts of Ground 3

With respect to Ground 3, the claim of ineffective assistance of trial counsel, Parsons did not assert certain grounds for counsel's ineffectiveness in any state court challenge to his conviction. In particular, Parsons did not mention the following alleged errors: trial counsel failed to call Parsons' grandmother as an alibi witness, Pet. at 32–33; trial counsel failed to subpoena two RPD investigators to testify about their report that contained information supportive of his alibi defense, *id.*; trial counsel failed to remove prospective juror McGlynn for cause, *id.* at 33; trial counsel failed to investigate "inconsistencies" at the crime scene, *id.* at 33–34; and trial counsel made prejudicial statements during his summation, *id.* at 36. These subgrounds were not presented in any fashion on direct appeal, or in any collateral motion, which deprived the state courts of the opportunity to rule on them. *See Daye*, 696 F.2d at 191–92 (citation omitted). Accordingly, they are unexhausted. *See id.*

### 5. Grounds 1(A), 1(B), 1(C), Parts of Ground 1(G), Parts of Ground 3, and Grounds 5, 7, and 8 Must Be Deemed Exhausted and Procedurally Defaulted

When a petitioner has no available means of exhausting claims in state court, they will be "deemed exhausted." *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (citing, *inter alia*, *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (finding that "[t]he requisite exhaustion may nonetheless exist, of course, if it is clear that respondent's claims [that were not fairly presented] are now procedurally barred under [the state's] law")).

Here, New York's procedural rules bar Parsons from attempting to raise Grounds 1(A), 1(B), and 1(C); parts of Ground 1(G), parts of Ground 3; and Grounds 5, 7, and 8 before the Court of Appeals since he already has used the one direct appeal to which he is entitled. *Zacher v. Graham*, No. 6:14-CV-06027(MAT), 2016 WL 368086, at *7 (W.D.N.Y. Feb. 1, 2016) (citing *Cunningham v. Conway*, 717 F. Supp.2d 339, 365 (W.D.N.Y. 2010) (citing N.Y. R. CT. § 500.20(a)(2), (d); other citations omitted).

Parsons is barred from obtaining collateral review of Grounds 1(A), 1(B), 1(C), 5, 7, and 8 because the issues were previously determined on the merits on direct appeal. Under the applicable procedural rules, a court deciding a C.P.L. § 440.10 motion to vacate the judgment would be mandated to deny those claims. *Zacher*, 2016 WL 368086, at *7 (citing N.Y. CRIM. PROC. LAW § 440.10(2)(a)). With regard to the parts of Ground 1(G) and record-based errors by trial counsel asserted in Ground 3 that were not presented in the *pro se* supplemental brief, a court considering a C.P.L. § 440.10 motion likewise would be required to deny them because "'sufficient facts appear on the record of the proceedings underlying the judgment' to have permitted Petitioner to raise the claim on direct appeal." *Cunningham*, 717 F. Supp.2d at 365 (citing N.Y. Crim. Proc. Law § 440.10(2)(c) (mandating that court dismiss claim if sufficient facts appeared on the record to have permitted direct review but defendant unjustifiably failed to raise claim on direct appeal)). With regard to the errors by trial counsel asserted in Ground 3 that are *dehors* the record,[5] they can be deemed exhausted but procedurally defaulted because, if

---

[5] Here the Court is referring to trial counsel's failure to call Parsons' grandmother as an alibi witness, failed to subpoena two RPD investigators to testify about their report that contained information supportive of his alibi defense, and failed to investigate "inconsistencies" at the crime scene. Even assuming they are unexhausted and cannot be deemed exhausted and procedurally defaulted, they are plainly meritless. The failure to investigate "inconsistencies" is too vague to state a colorable claim for habeas relief. And the claims regarding the failure to call Parsons' grandmother and the two RPD investigators are without merit as discussed below in Section VI.A.1 regarding the merits of Parsons exhausted ineffective assistance

Parsons presented them in a renewed 440.10 motion "would likely find them procedurally barred" pursuant to [C.P.L. §§] 440.30(1) and 440.10(3)(c)." *Rosas v. Artuz*, No. 05 CIV. 8440 RJS, 2013 WL 499610, at *12 n. 8 (S.D.N.Y. Jan. 29, 2013) (citing *Murden v. Artuz*, 497 F.3d 178, 192 (2d Cir. 2007) ("When analyzed against the [relevant] factors, subsection (3)(c) of C.P.L. § 440.10 constitutes an adequate state procedural bar to federal habeas review."); *Ramirez*, 280 F.3d at 94; citation to record omitted)).

Accordingly, Grounds 1(A), 1(B), 1(C), 5, 7, and 8, and parts of Grounds 1(G) and 3 must be "deemed exhausted." *Grey*, 933 F.2d at 120-21. However, "the procedural rule that leads to the constructive exhaustion" of Grounds 1(A), 1(B), 1(C), 5, 7, and 8, and parts of Grounds 1(G) and 3, "also creates a procedural bar to this Court's review of the claim[s]." *Zacher*, 2016 WL 368086, at *7 (citing *Grey*, 933 F.2d at 121); *see also Irons v. Ricks*, No. 02 CIV. 4806 (RWS), 2003 WL 21203409, at *8 (S.D.N.Y. May 22, 2003) (because petitioner "no longer has an available avenue to litigate [his] constitutional claim in state court," it "should be deemed constructively exhausted and procedurally forfeited") (citing *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996); other citations omitted).

To overcome the procedural default of Grounds 1(A), 1(B), 1(C), 5, 7, and 8, and parts of Grounds 1(G) and 3, Parsons "must show cause for the default and prejudice, or demonstrate that failure to consider the claim[s] will result in a miscarriage of justice (i.e., the petitioner is actually innocent)." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (citing

---

claim regarding the failure to introduce the police report that allegedly supported his alibi defense. Thus, even if they are unexhausted, they can be dismissed under the authority of 28 U.S.C. § 2254(b)(2). *See, e.g.*, *Williams v. Artus*, 691 F. Supp.2d 515, 526 (S.D.N.Y. 2010) ("Even if . . . a claim is unexhausted, 28 U.S.C. § 2254(b)(2) provides that '[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.' If the unexhausted claims are 'plainly meritless,' the district court can dismiss these claims on the merits. *Rhines v. Weber*, 544 U.S. 269, 277, 125 S.Ctr. 1528, 161 L.Ed.2d 440 (2005). The petitioner's claim is plainly meritless and therefore is denied on the merits.").

*Coleman v. Thompson*, 501 U.S. 722, 748–50 (1991)). Parsons has not attempted to demonstrate cause and prejudice or that a fundamental miscarriage of justice will occur if this Court does not review the merits of the procedurally barred claims. Accordingly, the Court dismisses Grounds 1(A), 1(B), 1(C), 5, 7, and 8, and parts of Grounds 1(G) and 3 on the basis that they are subject to an unexcused procedural default. *E.g., Zacher*, 2016 WL 368086, at *7.

### C. Ground 1(D)'s Prosecutorial Misconduct Claim Was Contained Within the *Brady* Claim Presented on Appeal of the 440.10 Motion and Is Exhausted

Ground 1(D) alleges a *Brady* claim based on the prosecutor's failure to disclose that Hall testified falsely the grand jury trial and a claim that the prosecutor committed misconduct by relying on Hall's testimony, which he knew to be false, to obtain Parsons' conviction, thereby denying Parsons his rights to due process and a fair trial. Pet. at 12–18.

Respondent argues that the aspect of the claim asserting that the prosecutor knowingly relied on false testimony was not fairly presented on appeal of the post-hearing denial of the 440.10 motion, since appellate counsel only asserted a *Brady* claim. However, in his brief, appellate counsel framed the *Brady* argument as follows: "Specifically, material evidence adduced at trial was false, the prosecutor knew it was false, and thus Mr. Parsons' conviction was obtained in violation of his due process rights[.]" SR.836 (citations omitted). Later in his argument, appellate counsel observed that the "'grossest kind of *Brady* violation' occurs where the prosecutor's misconduct is 'willful and designed to conceal the truth about the case from the factfinder[.]'" SR.838 (quotation omitted).

The Supreme Court has explained that "the *Brady* rule has its roots in a series of cases dealing with convictions based on the prosecution's knowing use of perjured testimony." *United States v. Bagley*, 473 U.S. 667, 680 n. 8 (1985) (citations omitted). Moreover, the Appellate Division framed Parsons' claim in essentially the same manner as it was articulated by appellate counsel in his brief. *See* SR.957–58 ("Defendant contends that the trial court erred in denying the motion because he established that, at the time of the trial, the prosecutor knew that a witness had testified falsely before the grand jury and at trial and that the prosecutor failed to meet his *Brady* obligation to provide defendant with notice of that allegedly false testimony."). The Appellate Division thus understood the dual bases for Parsons' claim based on Hall's alleged perjury—that the prosecutor knew of it but failed to disclose it in violation of *Brady* and then knowingly allowed Hall to perjure himself at trial. For these reasons, the Court finds that Parsons' claim alleging that the prosecutor knowingly presented false testimony in order to secure his conviction was exhausted along with his *Brady* claim.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. § 2254(d), "the standard governing federal habeas review depends on whether petitioner's claim has been previously 'adjudicated on the merits' by a state court." *Cotto v. Herbert*, 331 F.3d 217, 229–30 (2d Cir. 2003) (quoting 28 U.S.C. § 2254(d); footnote omitted). If the state court "adjudicated [a claim] on the merits," 28 U.S.C. § 2254(d), the federal court "shall not . . . grant[ ]" habeas relief "unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Significantly, the Supreme Court has held that "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Id.* at 100.

### MERITS OF THE AMENDED PETITION'S EXHAUSTED CLAIMS

I.    **Ground 1(D): *Brady* and Prosecutorial Misconduct Claims Based on Hall's Allegedly Perjured Grand Jury and Trial Testimony**

### A. Background Relevant to Ground 1(D)

As noted above, in support of his 440.10 motion, Parsons presented two affidavits from Hall. *See* SR.478-82 ("first affidavit"); SR.475–76 ("second affidavit"). In them, Hall asserted he perjured himself in the grand jury, confessed the perjury to the prosecutor who threatened him with criminal charges if he did not adhere to his perjurious testimony, and then perjured himself again at trial.

In the first affidavit (SR.478–82), dated August 7, 2008, Hall averred that, contrary to his trial testimony, he had not witnessed Wright's shooting but had arrived on the scene to find Wright lying injured in the street. Hall further asserted that Wright told him that someone had tried to rob him and that he did not know who shot him. Afterwards, Hall spoke to Latacha, who asked Hall who had shot Wright. Hall responded that he did not know. About a minute later, Hall declared, he and Latacha met up with Tucker, who was

high on crack. Tucker told them that he had heard a "guy named 'Prince'" a/k/a "Dre" (i.e., Parsons) shot "Devine" over a "beef." Tucker told them that he planned to name Parsons as the shooter because he had a "beef" with Parsons as a result of Parsons "put[ting] a gun in his face" for trying to steal drugs from him. Tucker said that the police "would give him drugs and money for his assistance in solving the crime." Hall decided to go along with Tucker's story because "wanted justice for [his] friend," Wright. SR.479. Latacha agreed as well, because Wright "was her man, and she felt obligated to him even if she had to lie." SR.479–80.

The first affidavit further stated that on August 15, 2001, Officer Correia stopped by Fulton Avenue in the late afternoon and informed Hall, Latacha, and Beans that Parsons had been arrested and that he needed Hall's "help to put him away for good." SR.480. Hall told him that "a few other people witnessed the crime," namely, Latacha and Beans. SR.480–81. Hall "believe[d]" that Latacha and Beans gave him their statements which "[the] three [of them] went over ahead of time." SR.481.

Hall claimed in the first affidavit that sometime after the shooting, he went to a building across from the state courthouse and told his story about the shooting to the prosecutor and a stenographer. SR.481. Immediately after this testimony, Hall informed the prosecutor that he had "just told a lie"—that he had not seen the shooting. SR.481. The prosecutor responded that he "didn't give a rats ass if [Hall] lied or not." SR.481. He informed Hall that he had "two options"—either "stick to his story and be in a good position with him and his office for future references" "or change [his] story and get charged for perjury and go to jail for a long time." SR.481.  The prosecutor later "promised" to "make a deal" with the prosecutor who had placed Hall in juvenile custody to "get [him] released

immediately after Andre Parsons was convicted." SR.482. Finally, Hall claimed the reason for his recantation was that he had "received God in [his] life." SR.482.

In the second affidavit (SR.475–76), dated September 11, 2008, Hall stated that he "unequivocally . . . was never a witness at" the grand jury proceedings in Parsons' case. SR.475. He claimed that the discussion in late August 2001 with the prosecutor and the "lady" who was "typing everything [he] said" was "never in front of a Grand Jury." SR.475. Hall also accused the prosecutor of creating "doctored" grand jury transcripts.

At the evidentiary hearing on November 7, 2014, Hall testified that he did not witness Wright being shot but came upon Wright lying injured in the street. Hall testified he knelt down next to Wright and asked Wright what happened. Wright said that somebody tried to rob him. When Hall asked who it was, Wright said he did not know. H.25.[6]

Hall testified that moments after the shooting, he spoke to Latacha. For the first time, Hall mentioned that he had also spoken to Beans. Contrary to what Hall stated in his first affidavit, Latacha told him she had been drinking upstairs and had "seen a person named Dre [Petitioner] shoot Divine [Wright]." H.27-28. Hall testified that Beans said he was going to tell the police he saw Parsons shoot Wright and urged Hall to "go along with the story." H.28, 30-31.

Shortly after the police arrived, Hall said, an officer brought him into a patrol car, showed him a picture of Parsons, and told him that "[t]his is the guy that killed your friend." H.28–29. The officer then produced a black binder containing the same photograph of Parsons, but with a circle drawn around it. According to Hall, the officer said, "I think you

---

[6] Citations to "H." refer to the transcript of the 440.10 hearing which is reproduced at SR.624–745, docketed as part of the State Court Record (ECF No. 44-2).

should talk to your friends," which Hall understood to mean that he should talk to his friends and "find out what the story is going to be." H.29–32.

Hall testified that after he got out of the police car, he talked to Latacha, Beans, and Tucker in front of Latacha's house. H.32–35. Hall recounted that Tucker suggested that they all "stick by" the same "story." H.33–34. Hall testified that Tucker's stated reason for identifying Parsons was to receive a favor from the police. H.33–34. Tucker told Hall that if he did not "go along with the story, the officers could charge" Hall with crimes he did not commit. H.34. After hearing that Latacha and Beans were going along with Tucker, Hall decided to do the same, although he told Latacha he did not think it was right. H.34–36.

Hall testified that some days later, he spoke to the officer who had showed him the photograph of Parsons. H.37–38. The officer told him that they had Parsons in custody and that Hall needed to go downtown. Hall did not tell the officer that he had not seen anything but simply said he was not going to go downtown. H.38. According to Hall, the officer responded that he did not care what Hall had or had not seen, that "[t]his is what it's going to be," and that Hall had better "get on board with [his] friends." *Id.*

Sometime after that, Hall testified, he went to a room in the courthouse with the prosecutor and a stenographer and stated under oath that Parsons shot Wright. H.38–43, 45. Hall claimed that after he left the room, he told the prosecutor that "the whole thing . . . was a lie." H.43, 49. The prosecutor responded that he did not care and that Hall "just better keep [his] mouth shut." H.43–44. According to Hall, the prosecutor implied that if Hall "stuck to" the story, Hall would receive help if he ever had legal difficulties. H.44, 47.

Hall also testified that, at the time of Parsons' trial, he told his Family Court attorney that his testimony was a lie; however, the attorney did nothing about it. H.48–49.

Hall testified that he never contacted Parsons after the trial, including after he was sent to state prison on a 20-year sentence for two counts of robbery. H.50, 53-54, 62–63. Hall claimed that he converted to Islam in prison, that he told an imam that he wanted to make amends for his false testimony but did not know who to tell, and that the imam said to let it be in that case. H.50-52.  After speaking to an outside minister in 2006 or 2007, Hall decided to write his two 440.10 affidavits, with the aid of an inmate advisor, recanting his grand jury and trial testimony. H.52–59.

On cross-examination, Hall acknowledged his grand jury testimony from August of 2001, but claimed that he only looked straight ahead during the proceeding, and thus did not see the 23-person grand jury. H.60–64. The prosecution called the grand jury court reporter who testified that the transcript constituted a verbatim record of Hall's testimony. H.89–91. Finally, the prosecutor called RPD Investigator Charles Dominic, who testified that on August 14, 2001, Hall was shown a photo array out of which he identified Parsons as the shooter. H.12–13.

Following the parties' submission of post-hearing briefs, SR.746–74, the 440.10 court issued a decision and order dated February 11, 2015, denying the 440.10 motion in its entirety. SR.775-88; *see also* Tr., Feb. 11, 2015, at 12–19. Essentially, the only portions of Hall's testimony that the 440.10 court found believable were that Hall was 15 years-old at the time of the shooting and that he knew Wright. The remainder of Hall's testimony, the 440.10 court found, "lacked inherent believability," "was inconsistent with

his Affidavits," and was "undermined" by his "demeanor at the hearing[.]" SR.777–83, 786, 788.

The 440.10 court specifically declined to credit Hall's testimony that Wright stated that he did not know who shot him; that the police pressured Hall to identify Parsons; that Hall told the prosecutor he lied to the grand jury; that the prosecutor responded to Hall's confession by threatening Hall; and that the prosecutor promised to help Hall with legal problems if he adhered to his story that Parsons shot Wright. SR.777–81. Accordingly, the 440.10 court concluded, Parsons failed to establish by a preponderance of the evidence that Hall testified falsely in the grand jury and at trial or that the prosecutor knew that Hall's testimony was false. SR.785. The 440.10 court also found that Parsons could not have been prejudiced by any such false testimony, given the "overwhelming proof" against him, including Wright's excited utterance and the testimony of the other three eyewitnesses (Latacha, Tucker, and Beans). SR.785.

In affirming the denial of the 440.10 motion, the Appellate Division found that "certain details of [Hall's hearing] testimony differed significantly from those provided in his affidavits, including details concerning how and to whom [Hall] admitted providing false testimony." 169 A.D.3d at 1426. The Appellate Division concluded that the 440.10 court "was entitled to determine, in view of the [evidence], that [Hall's] testimony was simply not credible" and that its "credibility determinations are entitled to great weight in light of its opportunity to see the witnesses, hear the testimony, and observe demeanor." *Id.*

**B. Law Relevant to Ground 1(D)**

The Supreme Court held in *Brady* that "[t]o the extent that [a] prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant." *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)). A prosecutor's due process obligation under *Brady* "exists whether or not the defense requests exculpatory evidence." *Lewis v. Connecticut Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (citing *United States v. Bagley*, 473 U.S. 667, 681-82 (1985); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (applying *Brady* to impeachment evidence)).

The Supreme Court has "distinguished three situations involving the discovery, after trial, of information favorable to the accused that had been known to the prosecution but unknown to the defense." *Bagley*, 473 U.S. at 678 (citing *United States v. Agurs*, 427 U.S. 97, 103-04 (1976)). At issue here is the situation involving "the prosecutor's knowing use of perjured testimony or, equivalently, the prosecutor's knowing failure to disclose that testimony used to convict the defendant was false." *Id.* (citing *Agurs*, 427 U.S. at 103-04).

"Whether one has obstructed justice by committing perjury is a factual determination. . . ." *United States v. White*, 240 F.3d 656, 660 (7th Cir. 2001). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)). A state court's factual determination regarding a witness's credibility must be presumed to be correct by this Court. *See* 28 U.S.C. § 2254(e)(1); *see also Cotto*

*v. Herbert*, 331 F.3d 217, 233 (2d Cir. 2003) (presumption of correctness as to the factual findings by the trial judge under 28 U.S.C. § 2254(e)(1) is "particularly important when reviewing the trial court's assessment of witness credibility"); *Shabazz v. Artuz*, 336 F.3d 154, 163 (2d Cir. 2003) ("Credibility determinations are properly within the province of the state court that presided over the trial and evidentiary hearing.").

### C.  Analysis of Ground 1(D)

The allegedly undisclosed *Brady* material is Hall's purported statement to the prosecutor, after the grand jury proceeding, that Hall had committed perjury. However, according to Parsons, the prosecutor ignored Hall's perjury confession and allowed him to testify at trial, where he gave testimony that repeated his allegedly false statements before the grand jury. Thus, if Parsons cannot establish the existence of perjury by Hall, he cannot establish the existence of evidence favorable to the defense, a necessary element of a *Brady* claim. Nor can he establish that the prosecutor suppressed the alleged evidence, also a necessary element of a *Brady* claim.

Here, the 440.10 court had ample opportunity to observe Hall's manner of answering questions and his demeanor during the hearing. The Supreme Court has made very clear that Section 2254(e)(1) "gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (discussing former 28 U.S.C. § 2254(d)).  In addition, the 440.10 court as well as the Appellate Division cited a number of inconsistencies in Hall's hearing testimony and affidavits. "One of the most common methods of attack[ing]" "the credibility of a witness . . . is by proof that the witness previously made a statement that is inconsistent with [his] current testimony." § 6094

Bases For Attacking Credibility, 27 Fed. Prac. & Proc. Evid. § 6094 (2d ed.) (footnote and citations omitted). Although the state courts did not identify the inconsistencies with specificity, a federal court "must determine what arguments or theories . . . could have supported the state court's decision. . . ." *Harrington*, 562 U.S. at 102. Upon reviewing the record, the Court observes that the inconsistencies could have included the following: Hall's affidavits claimed that he never testified in the grand jury, SR.475–76, yet at the hearing Hall acknowledged his grand jury testimony, H.6064, and the grand jury court reporter testified to the accuracy of the transcript indicating that Hall was sworn and gave testimony, H.89-91. Hall's affidavit claimed that he, Latacha, and Tucker met up right after the shooting to create their false story, SR.896, and did not talk to Beans until after Officer Correia came by on August 15, 2001, to tell them that Parsons had been arrested, SR.897. At the hearing, however, Hall testified that he, Latacha, Beans met up right after the shooting, and that he did not talk to Tucker until after he sat in the police car with the officer who allegedly pressured him to identify Parsons from a photo, H.28, 30–35. Hall's affidavit stated that Latacha told him that she had laid down on her floor once she heard gun shots and had not seen the shooting, SR.895, but at the hearing Hall testified that Latacha told him immediately after the shooting that she saw "Dre shoot Divine." H.27–28. These inconsistencies bear upon important aspects of Hall's version of events and cannot be dismissed as insignificant.

Parsons has not attempted to harmonize these inconsistencies in Hall's hearing testimony and affidavits. Nor has he come forward with any evidence, much less clear and convincing proof, to overcome the presumption of correctness accorded to the state court's factual determination that Hall's recantation and claim of perjury were unworthy of

belief. Instead, he merely repeats arguments made to, and rejected by, the 440.10 court and Appellate Division. Parsons thus has "not carried [his] heavy burden to overcome th[e] presumption [in § 2254(e)(1)]." *Carter v. Ercole*, 338 F. App'x 43, 45 (2d Cir. 2009) (unpublished opn.); *Buari v. Kirkpatrick*, 753 F. Supp.2d 282, 293 (S.D.N.Y. 2010) (finding that petitioner who "essentially rehashe[d] the same factual arguments he made before the Appellate Division, ha[d] not met his burden of rebutting the State Courts' findings by 'clear and convincing evidence'") (quoting 28 U.S.C. § 2254(e)(1)).

Based on an unattributed quotation in his Petition, Parsons apparently relies on *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003), a habeas case that, significantly, did not involve the application of 28 U.S.C. 2254(e)(1). *See* Pet. at 17. There, the state court had "explicitly refused to make any factual finding with respect to [the recanting witness]'s credibility, making the usual question of the degree of deference to accord such a finding inapplicable[.]" *Id.* at 107. The district court, on habeas review, had conducted an evidentiary hearing at which the recanting witness testified and had concluded that the witness had lacked any credibility.

Given the procedural status in *Ortega*, the Second Circuit's "task [was] thus to determine whether the district court clearly erred when it found that [the witness]'s recantation was false and his testimony at trial was true." *Id.* at 106. According to the Circuit, "a determination that [the witness]'s recantation was not credible is insufficient to establish that [his] trial testimony was not perjured. While a recantation must be 'looked upon with the utmost suspicion,' *Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir.1988), . . . its lack of veracity cannot, in and of itself, establish whether testimony given at trial was

in fact truthful." *Ortega*, 333 F.3d at 107 (internal quotation and citations omitted in original). This is the passage on which Parsons relies in his Petition.

The Court finds that *Ortega* is clearly distinguishable from this case because, unlike in *Ortega*, the 440.10 Court explicitly made an credibility finding with regard to Hall, stating in relevant part that "[u]pon considering the testimony of all the hearing witnesses, [it] hereby determines that the evidence presented did not establish that the Defendant's [sic] testimony before the Grand Jury and [at] Trial was perjurious." SR.874. Moreover, the 440.10 Court "[did] *not* credit" Hall's testimony that, immediately after being questioned by the prosecutor in front of the stenographer in August 2001, he told the prosecutor that he had "just lied" but the prosecutor had said he "did not care" and that Hall had "just better keep [his] mouth shut and go on about it." SR.869 (emphasis and alteration in original; quotation marks omitted). Parsons' reliance on *Ortega* is therefore misplaced. *See Buari*, 753 F. Supp.2d at 293 (finding petitioner's reliance on *Ortega* to be "unavailing, because in that case, the state court made no credibility finding, and the Second Circuit held that the district court erred in focusing on the credibility of a witness's recantation rather than on whether the witness testified truthfully at trial" but "[n]o such issues are presented here, since the State Courts explicitly found that Robinson's and Effort's trial testimony was truthful").

Given the 440.10 court's unrebutted factual findings that Hall's grand jury and trial testimony were not false, and that Hall did not inform the prosecutor that he had testified falsely, Parsons cannot establish the first and second *Brady* elements—that the prosecutor knew or had reason to know of favorable evidence in the form of Hall's alleged perjury. It stands to reason that "a prosecutor is only obligated to disclose information of

which he has either actual or constructive knowledge." *United States v. Bin Laden*, 397 F.Supp.2d 465, 481 (S.D.N.Y. 2005) (citing *Avellino*, 136 F.3d at 255). Parsons' inability to demonstrate actual or constructive knowledge on the part of the prosecutor with regard to Hall's alleged perjury is fatal to his *Brady* claim. *See Pizzuti v. United States*, No. 02 CR. 1237 LAP HBP, 2014 WL 4636521, at *38 (S.D.N.Y. Sept. 16, 2014) ("DiPietro's failure to show that the prosecution either had actual or constructive knowledge of Mustufaj's alleged statements regarding Celaj is fatal to th[e] [*Brady*] claim."). Because a *Brady* violation does not occur unless all three elements are present, the Court need not address the 440.10 court's finding regarding the materiality of Hall's alleged perjury.

## II. Grounds 1(E) and 1(F): Confrontation Clause and *Brady* Claims Based on Hall's Family Court/Juvenile Delinquency Records

### A. Background Relevant to Grounds 1(E) and 1(F)

On April 2, 2002, the first day of trial testimony, and prior to Hall taking the stand, trial counsel stated that he had just learned that Hall was "in juvenile custody," Tr.332, yet the prosecutor had repeatedly assured him that Hall had no criminal record. Tr.332–33. Asserting a *Brady* violation, trial counsel moved to preclude Hall from testifying. Tr.333–34. The prosecutor responded that he had run Hall's rap sheet, or NYSIS, and had found no record. He continued that he had first learned that Hall was in juvenile custody when he met with him the prior week and had promptly informed trial counsel by phone. Tr.334, 336–37, 410–13. Trial counsel, however, denied that he had been notified of this fact. Tr.337. The prosecutor explained that Hall's juvenile delinquency adjudication in Family Court was sealed under N.Y. Family Court Act §§ 381.2(1), 381.3(1). Tr.334–35.

The trial court denied the *Brady* motion, stating that "there are no records to turn over. How can he turn over any records. They are sealed." Tr.335, 337. When trial

counsel insisted that the prosecutor had failed to inform him immediately upon learning of Hall's juvenile record, the trial court responded, "I think the record has been made. The application is denied." Tr.341. However, the trial court did grant trial counsel's request for a judicial subpoena to obtain Hall's full juvenile record. Tr.341, 441.

During his testimony, Hall admitted that he had been removed from his parent's house and placed in juvenile detention because of various charges brought in Family Court. Tr.342–43, 369–70. Hall acknowledged that the police twice caught him "[j]oy riding in a stolen car"; that he had violated his probation; and that he had been caught selling cocaine. Tr.370–73. On cross-examination, Hall testified that he had been selling cocaine for two months on Fulton Avenue near the scene of the shooting, and that he and Wright had worked for another man selling cocaine together. Tr.371–72.

Two days later, trial counsel informed the parties that had received Hall's Family Court records the previous day. In addition to the "joy-riding" incidents about which Hall testified on cross-examination, trial counsel noted that Hall (1) had been arrested on two counts of third-degree assault on September 15, 2001, regarding an incident on Clarence Park involving John Steeb; (2) he and two others had stolen a Jeep Cherokee SUV and been charged with unauthorized use of a motor vehicle and related charges on October 29, 2001; (3) he had been arrested for stealing another car and reckless driving and charged with unauthorized use of a motor vehicle and related charges on January 2, 2002; and (4) he had been arrested for selling $20 of fake cocaine to an undercover officer on March 12, 2002, and charged with Imitation of a Controlled Substance and Petit Larceny. Tr.676–79. In addition, Hall's records contained a police report dated September 15, 2001, with a deposition from RPD Officer Carlos Santory (not a witness in

Parsons' case) stating that Hall was "known to be in the neighborhood threatening to shoot people." Tr.677, 679.

Trial counsel moved to dismiss the indictment pursuant to *Brady*, arguing that certain of the RPD personnel involved in the Wright investigation had also been involved in certain of Hall's juvenile arrests. In particular, when Hall was found in the stolen Jeep Cherokee, he gave a written statement to RPD Investigator Mace, one of the officers who had already testified at Parsons' trial, that he knew the vehicle was stolen. Tr.677. And, Officer Pearce, who also testified at Parsons' trial, was the undercover officer to whom Hall had sold fake cocaine in March 2002. Tr.678. Trial counsel contended that, although the prosecutor may not have been aware of Hall's juvenile record, knowledge of it should be imputed to the prosecution's office based on the RPD officers' knowledge. Tr.678–80. Trial counsel alternatively moved to strike Hall's testimony or to recall him for further questioning. Tr.680.

The prosecutor reiterated that he had no prior knowledge of Hall's sealed juvenile record and had informed trial counsel as soon as he learned Hall was in juvenile detention. He noted that trial counsel had already cross-examined Hall regarding his two "joy rides" in stolen cars (the unauthorized use of a motor vehicle charges from October 2001 and January 2002) and his drug sales. Tr.680–82.

Finding that trial counsel had already engaged in "extensive cross examination" of Hall, the trial court denied the defense motions to recall Hall, strike Hall's testimony, and dismiss the indictment based on a *Brady* violation. Tr.683. The trial court noted that Hall admitted selling drugs on two occasions and "joy riding on at least two separate occasions." Tr.682–83. According to the trial court, it was understandable that Hall, at age

47

fifteen, "would not know the specific charges regarding Possession of Stolen Property, Unauthorized Use of a Motor Vehicle or Grand Larceny or Attempted Grand Larceny[,]" and thus there was not "anything inappropriate based upon his responses." Tr.682. As to the "[t]he allegation regarding statements about threatening to shoot somebody," the trial court found it "totally irrelevant" because it was "sometime after" Wright's murder. Tr.682.

In his *pro se* supplemental appellate brief, Parsons raised both the *Brady* claim and Confrontation Clause claim based on the prosecutor's failure to disclose Hall's juvenile delinquency records and the trial court's failure to strike Hall's testimony or reopen cross-examination. The Appellate Division found no error in the trial court's denial of the motion to dismiss because "[a] juvenile delinquency adjudication in Family Court is not considered *Brady* material by th[at] [c]ourt[.]" *Parsons*, 13 A.D.3d at 1100 (citing *People v. Bennett*, 273 A.D.2d 914 (4th Dep't 2000)).[7] In any event, the Appellate Division held, even assuming the juvenile adjudication was *Brady* material, Parsons "'had a meaningful opportunity' to cross-examine the eyewitness "with respect to the charges underlying that adjudication[.]" *Id.* (quoting *Bennett*, 273 A.D.2d at 914). The Appellate Division summarily denied the Confrontation Clause claim. *Parsons*, 13 A.D.3d at 1100 (rejecting "remaining contentions" as "without merit").

---

[7] The Appellate Division has held that although a defendant is entitled, for purposes of impeachment, to cross-examine a witness with respect to the acts underlying his youthful offender adjudication, information concerning those underlying acts does not constitute *Brady* material "[a]bsent a connection to the crime charged[.]" *People v. Battee*, 122 A.D.2d 526, 527 (4th Dep't 1986) (holding that it "was collateral and . . . not otherwise the kind of material required by the courts to be supplied to defendant for use to impeach a witness") (citing *Bagley*, 473 U.S. 667, *supra*; *Giglio v. United States*, 405 U.S. 150, *supra*). However, the Supreme Court has expressly "rejected any . . . distinction between impeachment evidence and exculpatory evidence[,]" *Bagley*, 473 U.S. at 676, holding that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within th[e] general rule [of *Brady*][.]" *Id.* at 677 (quoting *Giglio*, 405 U.S. at 154). It is, however, unnecessary to resolve the issue here because New York law "is not controlling in this federal proceeding[,]" *United States v. Canniff*, 521 F.2d 565, 568 (2d Cir. 1975) (citation omitted), and the Appellate Division's rejection of the claim did not amount to an unreasonable application of *Brady*.

The Court will first discuss Ground 1(F), the *Brady* claim, followed by Ground 1(E), the Confrontation Clause claim.

### B. Ground 1(F):  *Brady* Violation Based on Nondisclosure of Hall's Family Court/Juvenile Delinquency Records

#### 1.  Law Relevant to Ground 1(F)

The Supreme Court has identified "three components of a true *Brady* violation," that is, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

The prosecution "suppresses" impeachment or exculpatory evidence in violation of *Brady* when it has possession or knowledge of such evidence but fails to disclose it to the defense. *E.g.*, *Kyles v. Whitley*, 514 U.S. 419, 431 (1995). Significantly, "disclosure prior to trial is not mandated" under *Brady* and its progeny. *Leka*, 257 F.3d at 100 (citations omitted). "Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006). Thus, the Court must look at "the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made[,]" *id.*, in determining whether the evidence "suppression" has occurred. *See Leka*, 257 F.3d at 103 (holding that "the prosecution failed to make sufficient disclosure [of a witness' testimony] in sufficient time to afford the defense an opportunity for use" and therefore that "testimony was 'suppressed' by the prosecution") (citing *Brady*, 373 U.S. at 87–88).

"[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner. There is no *Brady* violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial. . . ." *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) (quotation omitted). Thus, "'materiality' and the timing of a disclosure required by *Brady* are linked[.]" *Barney v. Conway*, 730 F. Supp.2d 264, 277 (W.D.N.Y. 2010) (citing *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001)).

### 2.  Analysis of Ground 1(F)

Prior to receiving the Family Court records by subpoena, trial counsel cross-examined Hall with regard to three of the four incidents recounted in those records. Thus, trial counsel "knew . . .  of the essential facts permitting him to take advantage of any [impeachment] evidence." *DiSimone*, 461 F.3d at 197. Hall acknowledged the facts underlying both sets of charges involving the unauthorized use of motor vehicles, which he characterized as "joyriding" and admitted was "riding in a stolen car." Tr.370–71, 373. Similarly, trial counsel extensively cross-examined Hall with regard to his drug-selling activities, questioning him at length about whether he sold drugs on his own and with Wright; the inquiry on this topic went well beyond the single charge of selling fake cocaine to an undercover officer that was referenced in the Family Court records. Tr.371–76, 401–05. In sum, trial counsel subjected Hall to as much impeachment questioning as he could on three of the incidents referenced in Hall's Family Court records, given the prohibition imposed by New York law against cross-examination regarding youthful offender or

juvenile delinquency adjudications. *People v. Gray*, 84 N.Y.2d 709, 712 (1995) (citations omitted).

With regard to the fourth incident, involving Hall's alleged assault of another man in September 2001, Respondent asserts that the record is unclear as to whether Hall was found guilty on those charges. Tr.676–79. But in New York, "inquiry into the actual nature of the acts constituting the basis for the youthful offender or juvenile delinquency adjudication is permitted, and a defendant can even be impeached with prior bad acts that did not result in a criminal charge[.]" *Gray*, 84 N.Y.2d at 713.

Nevertheless, it is well settled that "undisclosed impeachment evidence is not material in the *Brady* sense when, although 'possibly useful to the defense,' it is 'not likely to have changed the verdict.'" *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) (quoting *Giglio*, 405 U.S. at 154). In such cases, "the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial." *Giglio*, 405 U.S. at 154.

The evidence regarding the assault in September 2001 "merely furnish[d] an additional basis on which to challenge" Hall, who had already been "subject to extensive attack by reason of other evidence," *Id.* at 154. The Court agrees with Respondent that "the impeachment value of the undisclosed evidence was incremental," *United States v. Jackson*, 695 F. App'x 605, 607 (2d Cir. 2017) (summ. order), and not material for *Brady* purposes. *See id.* (undisclosed evidence that coconspirator had been recorded discussing apparent drug trafficking on an intercepted wiretap in an unrelated criminal investigation was immaterial and thus did not warrant new trial on charges relating to filing of fraudulent tax returns under *Brady* where coconspirator's credibility was already

undermined by his three prior drug convictions and his admitted participation in the tax fraud scheme).

Finally, as to the statement in Officer Carlos Santory's ("Officer Santory") report in connection with the September 2001 assault—that Hall was "known to be in the neighborhood threatening to shoot someone"—Respondent argues that it is "rank hearsay" which the trial court was "within its discretion" in precluding, and further contends that "the failure to disclose such information could not bottom a *Brady* claim." Resp. Mem. at 40 n. 12. To the extent that Respondent argues that the report was not *Brady* evidence simply because it was hearsay, the Court disagrees. "*Brady* evidence often comes in the form of written court statements that appear to be hearsay evidence on their face." *Waldrip v. Humphrey*, 532 F. App'x 878, 885 (11th Cir. 2013) (*per curiam*) (unpublished opn.) (citing *Smith v. Cain*, 566 U.S. 73, 75 (2012) (investigating detective's notes containing witness statements); other citations omitted).

However, the Court agrees that the statement in the police report has not been shown to be "material" *Brady* information, and thus Parsons has not established he was prejudiced by its nondisclosure. The statement in Officer Santory's report that Hall was "known to be" threatening to shoot people appears to be double hearsay not subject to any exception. *See*, *e.g.*, *Ash v. Reilly*, 433 F. Supp.2d 37, 45 (D.D.C. 2006) (unsworn verbal allegations of four or five unidentified individuals who purportedly identified parolee as attacker in assault by pointing in street and screaming "that's him" were not reliable hearsay statements, when neither police report nor police officer's testimony established that any of individuals personally witnessed assault, and it was equally plausible that such persons only saw parolee running down street).

"To be material under *Brady*, undisclosed information or evidence acquired through that information must be admissible." *United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir. 1989) (citing *Brady*, 373 U.S. at 89–90; other citations omitted). Evidence that is inadmissible under state law can itself have no "direct effect on the outcome of a trial." *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (*per curiam*). While "such material could be material under *Brady* if it would 'lead directly' to admissible evidence[,]" *Wogenstahl v. Mitchell*, 668 F.3d 307, 325 (6th Cir. 2012) (quotation and citation omitted), "conclusions that such inadmissible material would 'lead' to admissible, exculpatory evidence cannot be based on 'speculation with slight support.'" *Id.* (quoting *Wood*, 516 U.S. at 8).

Parsons has offered nothing more than speculation that this police report could have led to the discovery of admissible, material evidence. Even assuming that Hall made those threats in the area where Wright was murdered, Officer Santory's report does not indicate when they occurred. The assault which was the subject of the report occurred in September 2001, months *after* the actual shooting, which suggests that the threats were contemporaneous with that incident. Thus, Parsons' suggestion that "these [unidentified] people" whom Hall allegedly was threatening could have been "possible alibi witnesses for [Parsons]," Pet. at 19–20, is speculative, at best.

In sum, three of the non-disclosed criminal incidents were not "suppressed" because trial counsel had knowledge of the essential underlying facts to meaningfully cross-examine Hall about them. Parsons was not prejudiced by the non-disclosure of the fourth criminal incident (the 2001 assault) because it was cumulative and not material. Likewise, he was not prejudiced by non-disclosure of the statement about his alleged threats in the neighborhood because it was inadmissible and thus not material. The Court

accordingly concludes that Appellate Division's holding that a *Brady* violation did not occur was neither an unreasonable application of, nor contrary to, *Brady*.

### C. Ground 1(E): Confrontation Clause Claim Based on Hall's Family Court Records

#### 1. Law Relevant to Ground 1(E)

"The Sixth Amendment's confrontation right, which applies equally to defendants in state prosecutions, . . . includes a right of cross-examination, which provides 'the principle means by which the believability of a witness and the truth of his testimony are tested.'" *Nappi v. Yelich*, 793 F.3d 246, 251 (2d Cir. 2015) (quoting *Davis v. Alaska*, 415 U.S. 308, 315 (1974); alterations omitted). Nonetheless, that right is not unlimited, and "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

"If the purpose of cross-examination is to explore more than general credibility, the subject of inquiry is not collateral." *Dunbar v. Harris*, 612 F.2d 690, 693 (2d Cir. 1979) (citing *United States v. Garrett*, 542 F.2d 23, 26 (6th Cir. 1976)). "The question is whether the defendant's inability to examine the witness precludes defendant from testing the truth of the witness's direct testimony, or whether the 'answers solicited might have established untruthfulness with respect to specific events of the crime charged.'" *Id.* (quoting *United States v. Cardillo*, 316 F.2d 606, 613 (2d Cir.), *cert. denied*, 375 U.S. 822 (1963)).

#### 2. Analysis of Ground 1(E)

In the present case, the criminal activities described in the records of Hall's Family Court juvenile delinquency proceedings were wholly unrelated to the homicide for which

Parsons was on trial. They were, instead, "purely collateral" because "they related solely to [Hall's] credibility as a witness" and not to the "subject matter of his direct examination." *Cardillo*, 316 F.2d at 611 (after "admitting to a substantial criminal record," prosecution witness "invoked the privilege against self-incrimination when asked whether he committed other crimes in the past and whether he was guilty of certain crimes with which he was then charged in the state courts"; circuit court held that "[t]hese questions were purely collateral for they related solely to his credibility as a witness and had no relation to the subject matter of his direct examination"). Thus, the trial court was well within its discretion in declining to allow defense counsel to recall Hall for additional cross-examination. *See id.*

Even assuming that there was a Confrontation Clause error—which there was not—it was harmless. First, Hall already had been subjected to extensive cross-examination about the facts underlying three out of the four incidents referenced in his juvenile delinquency records from Family Court, and any further questioning about them would have yielded cumulative testimony. Moreover, the testimony had little importance because it concerned only Hall's general credibility and not the crime with which Parsons was charged or the veracity of Hall's testimony about the shooting. *See Delaware v. VanArsdall*, 475 U.S. 673, 684 (1986) (among the factors to consider in evaluating harmlessness are "the importance of the witness' testimony;" whether the testimony was "cumulative;" and "the extent of cross-examination otherwise permitted").

With regard to the police officer's report stating Hall was "known to be" threatening to shoot people, its exclusion was not erroneous as a matter of evidentiary law. The statement that Hall was "known to be" threatening to shoot people is not attributed to any

particular person; it is hearsay within hearsay and does not appear to be subject to any exception. "[T]he right to cross-examine does not allow a litigant to elicit testimony that is otherwise inadmissible." *United States v. Lawrence*, 349 F.3d 109, 120 (3d Cir. 2003). Even assuming it was admissible, its exclusion was harmless because Hall already had been subjected to extensive cross-examination about his criminal activities. The alleged threats, which concerned only Hall's general credibility and not the crime with which Parsons was charged, was collateral to the subject matter of Hall's direct testimony. *See Cardillo*, 316 F.3d at 613 (holding that prosecution witness's refusal to answer questions about prior criminal activity did not violate Confrontation Clause where questions "were purely collateral for they related solely to his credibility as a witness").

### III.    Ground 1(G): Prosecutorial Misconduct at Trial

In his *pro se* supplemental appellate brief, Parsons exhausted a prosecutorial misconduct claim based on the following alleged improper acts: the prosecutor made a comment during his opening statement referencing evidence about Parsons' consciousness of guilt that was never produced; the prosecutor disregarded a pre-trial evidentiary ruling by questioning witnesses about Parsons' drug-selling activities; and the prosecutor bolstered witnesses' credibility during his summation. Parsons repeats this claim in his Petition. *See* Pet. at 22–25. On direct appeal, the Appellate Division rejected the prosecutorial misconduct claim as among the "remaining contentions" raised that were without merit. *Parsons*, 13 A.D.3d at 1100. As discussed below, this adjudication was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

### A.  Law Relevant to Ground 1(G)

In *Jackson v. Conway*, 763 F.3d 115, 144 (2d Cir. 2014), the Second Circuit identified four key Supreme Court decisions, *Berger v. United States*, 295 U.S. 78 (1935), *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), *United States v. Young*, 470 U.S. 1 (1985), and *Darden v. Wainwright*, 477 U.S. 168 (1986), relevant to claims of prosecutorial misconduct. From these cases, the Second Circuit distilled several principles which it held to be "clearly established" law governing prosecutorial misconduct claims. *Jackson*, 763 F.3d at 144 (footnote omitted). Importantly, "on federal habeas review, the relevant standard is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Id.* at 146 (quoting *Darden*, 477 U.S. at 180; further quotation and quotation marks omitted). A prosecutor's use of "improper methods will warrant habeas relief only if[,]" "considering the record as a whole," "they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process,'" *Id.* (quoting *Darden*, 477 U.S. at 180; further quotation and quotation marks omitted).  The reviewing court must be careful to distinguish between "ordinary trial error of a prosecutor" and the type of "egregious misconduct . . . [that] amount[s] to the denial of constitutional due process." *DeChristoforo*, 416 U.S. at 647–48.

### B.  Analysis of Ground 1(G)

#### 1.  Improper Comment During Opening Statement

First, Parsons takes issue with the prosecutor's comment, in his opening statement, that "[a]fter the shooting, the defendant ran with gun. but the police were looking for him, where did they find him? Well, the police got a tip. They found him at the downtown bus station the next day on the 15th, leaving town. What does that tell you?" Tr.326.  Defense counsel's objection was overruled.

The record indicates that the prosecutor had intended to call two RPD investigators to provide testimony regarding their apprehension of Parsons at the bus station. Subsequently, however, trial counsel moved to preclude all testimony about the bus stop, arguing, among other things, that Parsons was found at the bus stop two days after the shooting, and that the tickets were in his girlfriend's possession. Tr.712–13, 717–18. The trial court granted the motion because Parsons' girlfriend had offered the police an innocent explanation for having the tickets, namely, that she was traveling out of state to care for a sick relative. Trial counsel did not request a curative charge as to the opening remark. Tr.715–16, 718.

The Supreme Court has observed that "[m]any things might happen during the course of [a] trial which would prevent the presentation of all the evidence described in advance." *Frazier v. Cupp*, 394 U.S. 731, 736 (1969). For this reason, "not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given." *Id.*  The Supreme Court stated that "[a]t least where the anticipated, and unproduced, evidence is not touted to the jury as a crucial part of the prosecution's case," it is not "remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial." *Id.*

Here, as in *Frazier*, the prosecutor had a good faith basis for making the opening remark, as he believed that the officers would testify in conformance with their investigative reports. Tr.12. Moreover, the bus-stop evidence was not mentioned again during the trial and was not emphasized as a "crucial part of the prosecution's case." *Frazier*, 394 U.S. at 736. Finally, the trial court informed the jury, prior to opening statements, that such statements were not evidence, and that the evidence upon which

the jurors would base their verdict would be limited to the witnesses' testimony and the exhibits. Tr.311. The trial court further instructed the jury that the attorneys' summations, "like the opening statements, are not evidence." Tr.793, 803, 814, 823–25.  "Since the jury must be presumed to have followed these instructions, [Parsons] cannot establish that he suffered any prejudice from the prosecutor's remarks during his opening statement." *Covington v. Warden, Five Points Corr. Fac.*, No. 11CV8761-AT-FM, 2014 WL 7234820, at *14 (S.D.N.Y. Dec. 8, 2014) (citing *Francis v. Franklin*, 471 U.S. 307, 324 n. 9 (1985) ("Absent . . . extraordinary situations . . . we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions.")), *report and recommendation adopted*, No. 11CIV8761ATFM, 2016 WL 3407845 (S.D.N.Y. June 16, 2016).

### 2.  Disregard of a Pre-Trial Evidentiary Ruling

Parsons contends that the trial court issued a ruling that prohibited the prosecutor from referring to his drug use or drug-selling activity. However, this is inaccurate. All the ruling in question stated was that, should Parsons testify, the prosecutor could question him about certain of his criminal convictions but not others. Tr.37–41. In any event, this ruling was mooted by Parsons' failure to testify.

As Respondent points out, there was no explicit ruling by the trial court on this issue. Prior to trial the prosecutor argued that "some evidence of the alleged argument [between Parsons and Wright] pertaining to the sale of drugs should be allowed in," not for its truth, but because it was "inextricably interwoven with the facts surrounding this entire case." Tr.41–42. Trial counsel countered that this line of questioning had no basis in the record. Tr.42–43. However, the trial court apparently never issued a ruling on the

prosecutor's request. In any event, the prosecutor faced no objection from trial counsel and no admonishment by the trial court when he stated, on opening, that Parsons and Wright had been engaged in a turf war over drugs, Tr.323–24, and later questioned Tucker and Gollogly about whether they had purchased drugs from Parsons. Tr.584, 612–13, 763. When trial counsel did successfully object to the prosecutor's questions about Parsons' drug use, it was not on the basis that a court ruling had been disregarded. Tr.572, 765. In short, there was no such court ruling precluding the prosecutor from mentioning Parsons' drug use and drug sales. Therefore, Parsons' argument lacks a factual basis and is without merit.

### 3.  Improper Summation Comments

According to Parsons, the prosecutor committed misconduct on summation because he (1) called the defense's alibi witnesses (Gollogly and Langen) liars by referring to them as "dishonest," Tr.811; (2) vouched for the credibility of the People's witnesses by stating that they had "no reason to lie," Tr.813–17; and (3) referred to "uncharged crimes" and "matters not in evidence" by asserting that Latacha had testified to being threatened by Parsons' "friends."

With regard to the first comment, as a general matter, "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory." *United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002). Here, Gollogly's and Langen's testimony was "disputed" and "clearly in issue." Moreover, the two witnesses, who were in the same apartment at the same time, did not testify consistently with each other. Gollogly stated that he saw Parsons pass his doorway once, while Langen's testimony

contradicted Gollogly's testimony (she stated that Gollogly was with her when Parsons passed by a second time) and her own police statement. *See* Tr.755–56, 762, 771, 776–78.  Under these circumstances, the prosecutor's one-time use of the word "dishonest" to characterize their testimony was not excessive.

Finally, the Court cannot find improper vouching based on the prosecutor's comments that the prosecution's witnesses had no reason to lie. There is no suggestion in his commentary that he "had access to evidence outside the record." *United States v. Young*, 470 U.S. 1, 19 (1985); *see also*, *e.g.*, *United States v. Williams*, 690 F.3d 70, 76 (2d Cir. 2012) (finding no improper vouching where, in characterizing the testimony of prosecution witnesses as "the truth" or the "absolute truth," the prosecutor "did not suggest that [s]he had special knowledge of facts not before the jury") (citation omitted); Courts routinely have held that a prosecutor neither shifts the burden of proof nor improperly vouches for witnesses by pointing out that they had no motive or no reason to lie. *E.g.*, *Everett v. Fischer*, No. 00-CV-6300 (NG), 2002 WL 1447487, at *3 (E.D.N.Y. July 3, 2002) (citing *Connery v. State of N.Y.*, No. 93 CIV. 1448 (PNL), 1993 WL 119797, at *1 (S.D.N.Y. Apr. 13, 1993)  (Leval, D.J.) ("For a prosecutor to assert in closing argument . . .  that the complaining witness had no reason to lie is perfectly reasonable.")).

In sum, none of the challenged actions and comments by the prosecutor were improper, much less the type of "egregious misconduct" that has been held to warrant reversal of a conviction. As the Appellate Division's rejection of the prosecutorial misconduct claim was not an incorrect application of federal law, it necessarily cannot be contrary to, or an unreasonable application of, that law. *See*, *e.g.*, *Henry v. Poole*, 409 F.3d 48, 68 (2d Cir. 2005) ("[T]he term 'unreasonable application' of federal law means

more than simply an 'erroneous' or 'incorrect' application[.]") (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)).

IV.   **Ground 1(H): Alleged "Orchestration" of Prejudicial News Broadcast by Prosecutor**

**A. Background Relevant to Ground 1(H)**

On the first day of trial, Monday, April 1, 2002, just prior to jury selection, trial counsel informed the parties that, over the weekend, a local cable news channel had run interviews with Joyce Powell ("Powell"), the victim's mother, and First Assistant District Attorney Mike Green. Tr.20-21. According to trial counsel, Powell claimed that Parsons had been charged with committing a homicide the previous year but avoided prosecution by intimidating witnesses. Tr.22-23. Trial counsel requested an adjournment or, in the alternative, that individual *voir dire* of the jurors be conducted to determine their exposure to the broadcast. Tr.21–22.

After reviewing a recording of the broadcast, the trial court observed that the "mention of a prior proceeding and some of the other statements that were made" were "extremely prejudicial" to Parsons, such that any juror who was exposed to the broadcast would likely have to be excused. Tr.28–29. However, the trial court declined to adjourn the proceedings and stated that it would collectively ask the prospective jurors whether they had viewed any pre-trial publicity and then individually *voir dire* any jurors who responded affirmatively. Tr.29–31.

The trial court subsequently informed the prospective jurors that "there may have been some pre-trial publicity either by newspaper, radio, television or even on web sites," and that "[i]f any of you know anything about this particular case, you need to volunteer that information." Tr.58. No prospective jurors indicated that they had seen the news

broadcast at issue. One juror, Juror Heath, stated that six months earlier, he had read an article about the case. Thus, the article Juror Heath read had nothing to do with the broadcast with Powell that aired months later. Tr.83–86. The trial court repeatedly instructed the jury, going forward, not to read any news accounts of the trial or listen to any news broadcasts about it. Tr.316, 445, 669, 817–18.

Petitioner asserts, as he did in his *pro se* brief on direct appeal, that the prosecutor "orchestrated" a cable news broadcast just prior to trial in which the victim's mother accused petitioner of an uncharged homicide. *See* Pet. Ground 1(H); SR.284-86. On direct appeal, the Appellate Division summarily denied this claim as without merit. *Parsons*, 13 A.D.3d at 1100 (rejecting "remaining contentions" as "without merit"). The Court finds that the Appellate Division did not unreasonably apply, or rule in a manner contrary to, clearly established Supreme Court precedent, or make an unreasonable determination of the facts in light of the evidence presented.

### B. Analysis of Ground 1(H)

Parsons frames this claim as one of prosecutorial misconduct. However, there is no factual support for the contention that the prosecutor handling Parsons' trial was involved in the news story. Indeed, the prosecutor did not interview Wright's mother, the first assistant district attorney did. In any event, as the prosecutor observed, he could not control what Powell said to the media. Tr.25. Nor is there any indication that Powell was coached by the first assistant district attorney about what to say. It bears noting that, after reviewing the tape, the trial court did not admonish the prosecutor about the broadcast. Tr.28–31. Accordingly, the Court finds that the prosecutorial misconduct claim lacks a factual basis in the record and cannot provide a basis for habeas relief. *E.g.*, *Mills v.*

*Lempke*, No. 11-CV-0440 MAT, 2013 WL 435477, at *23 (W.D.N.Y. Feb. 4, 2013) (habeas claim lacking record support and based on speculation cannot provide habeas relief) (collecting cases).

### V.   Ground 2: Ineffective Assistance of Pre-Trial Counsel Based on Failure to Protect Right to Testify in Grand Jury

#### A.  Background Relevant to Ground 2

Parsons complains that Joel N. Krane, Esq. ("Krane"), who was substituted for Mark Funk, Esq. ("Funk"), took a position "adverse" to his with regard to his desire to testify in the grand jury. Prior to being relieved,[8] Funk sent the prosecutor a letter stating that Parsons had elected to testify. SR.282–83. At Parsons' next court appearance, Krane informed the trial court that Parsons had taken his advice not to testify in the grand jury and was waiving his right to testify before that body. However, after being indicted, Parsons disclaimed his waiver of the right  to testify. *See* Tr., Sept. 10, 2001, at 2–7. At Krane's request, he was relieved of further representation of Parsons.[9]

#### B.  Law Relevant to Ground 2

The familiar test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for evaluating an ineffective assistance of counsel claim has two prongs. The first requires showing that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688, 694. "Constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have

---

[8] Funk represented Parsons for two days but was relieved by the trial court on August 17, 2001, because, (1) contrary to Funk's advice, Parsons insisted upon testifying in the upcoming grand jury proceeding; and (2) Funk had a scheduling conflict that would prevent him from accompanying Parsons in the grand jury. SR.282.

[9] David Murante, Esq., was appointed but also was relieved due to his prior representation of a witness in this case. On November 16, 2001, the trial court appointed Lawrence L. Kasperek, Esq., who represented Parsons at trial.

rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). Fulfilling the second prong of an ineffective assistance claim requires a showing of prejudice which translates to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "The habeas petitioner bears the burden of establishing both deficient performance and prejudice." *Greiner*, 417 F.3d at 319 (citing *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004)).

### C. Analysis of Ground 2

Respondent asserts that this claim is not cognizable on federal habeas review because there is no federal constitutional right to be indicted by a grand jury prior to trial in a state criminal action, and in any event, any defects in the grand jury proceeding are cured by the petit jury's guilty verdict.

The Court notes that a number of habeas courts have followed this analysis. At the same time, the right of a New York defendant to testify before a grand jury is protected by state statute. N.Y. Crim. Proc. Law § 190.50(5). In the context of a violation of under *People v. Rosario*, 173 N.E.2d 881 (N.Y. 1961), which is also a purely state law right, courts in this Circuit have stated that a habeas court can review an ineffective assistance of counsel claim based on a failure to pursue a viable *Rosario* claim. *Rodriguez v. Smith*, No. 10-CV-8306 KMK LMS, 2015 WL 6509153, at *16 (S.D.N.Y. Oct. 28, 2015) (citing *Flores v. Demskie*, 215 F.3d 293, 303–04 (2d Cir. 2000) (analyzing an ineffective assistance of counsel claim based on defense counsel's waiver of a *Rosario* claim)).

Courts that have considered the merits of claims based on trial counsel's failure to effectuate a petitioner's right to testify before the grand jury have held that such an omission "does not, by itself, establish ineffective assistance of counsel." *Boyd v. Hawk*, 965 F. Supp. 443, 451 (S.D.N.Y.1997) (quoting *Kohler v. Kelly*, 890 F. Supp. 207, 213 (W.D.N.Y.1994), *aff'd mem.*, 58 F.3d 58 (2d Cir.1995)). The missing element in these cases has been prejudice—the petitioner has "not demonstrated that but for trial counsel's failure to have him testify before the grand jury, there is a reasonable probability of a different outcome—that is, an indictment on no or fewer charges." *Dearstyne v. Mazzuca*, 48 F. Supp.3d 222, 297–98 (N.D.N.Y. 2011); *see also Boyd*, 965 F. Supp. at 451 ("Boyd fails to allege or show prejudice, i.e., he presents no argument that if he had appeared before the grand jury, the grand jury's action would have been any different."). Parsons likewise has failed to fulfill the prejudice prong of *Strickland,* which "is fatal to his ineffective assistance claim." *Dearstyne*, 48 F. Supp.3d at 298.

## VI.    Ground 3: Ineffective Assistance of Trial Counsel

As discussed above, the Court has found that Parsons exhausted the following subgrounds of Ground 3 by raising them in his *pro se* supplemental appellate brief: trial counsel failed to offer into evidence a certain police report by RPD Investigators Charles Dominic ("Investigator Dominic") and Gary Sullivan ("Investigator Sullivan") which supported his alibi that he was at home at the time of the murder; trial counsel failed to object to certain photographs of the crime scene taken several days after the shooting on the basis that several witnesses testified that the actual light conditions were darker on the night of the shooting; trial counsel failed to object to the bloodied t-shirt worn by Wright on the basis that the medical examiner's office never had the opportunity to examine it

for gunshot residue; and failed to cross-examine Hall with a police report stating that Hall had informed officers that the suspect had a tattoo of the word, "Prince" when in fact Parsons had no such tattoo. *See* Pet. at 32–33, 35–36.

These claims were included in the Appellate Division's summary dismissal of Parsons' "remaining contentions" as nonmeritorious. This adjudication on the merits does not represent an incorrect application of *Strickland*, much less an unreasonable application of that case.

In addition, the Court considers the potentially unexhausted claims that trial counsel erroneously failed to call Investigators Dominic and Sullivan, and Parsons' grandmother, as witnesses. These claims are plainly meritless under *Strickland* and are properly dismissed under 28 U.S.C. § 2254(b)(2).

### A. Analysis of Ground 3

#### 1. Failure to Call Witnesses and Introduce Evidence at Trial

With regard to trial counsel's failure to call Investigators Dominic and Sullivan and introduce their investigative report, and failure to call Parsons' grandmother in support of his alibi defense, the Court finds that these represent strategic decisions that were entirely reasonable under the circumstances. As an initial matter, it is well settled that "'[t]he decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." *Greiner*, 417 F.3d at 323 (quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (*per curiam*); second alteration in original). Indeed, an attorney's decision not to call "'specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional

representation.'" *Id.* (quoting *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000); further quotation omitted).

Significantly, the police report about which the investigators would have testified, SR.345–46, was inculpatory. First, it stated that, following the shooting, Hall "immediately picked out" Parsons as the shooter from a photo array, stating "'That's Dre.'" SR.345. Second, when they approached Parsons' grandmother, Ruth Thomas ("Thomas") and said they wanted to speak with her about an incident involving Parsons, she "asked if it was a shooting investigation." SR.345. Upon learning it was, Thomas volunteered that "Andre has a gun and that she would help [them] in any way she could." SR.345. Thus, Thomas would not have been helpful to the defense.

Moreover, the report added little to Parsons' alibi defense and thus was of minimal exculpatory value. It stated that Thomas' cell phone records showed an incoming call at 11:39 p.m. on the night of the shooting. The number returned to Erin Taylor ("Taylor"), Parsons' girlfriend, of 70 Lakeview Park, Apartment #105, where Parsons purportedly also resided. SR.345-46, Tr.773-74. Thomas told the officers that Parsons had called to ask her to drive Taylor to her aunt's house. SR.345.

Contrary to Parsons' contention, the report does not prove that he "was at his place of residence when this crime occurred[.]" Pet. at 32. Officer Pearce testified that he and Officer Correia were dispatched to the shooting at about 11:20 p.m. Tr.613-15. Officer Correia testified that they were the first to respond. Tr.645-47, 657. Accordingly, the shooting presumably took place before 11:20 p.m. Parsons allegedly resided at 70 Lake View Park in Rochester, which is about 1.1 miles from 125 Fulton Avenue, where the

shooting occurred. Walking at a moderate page (15 minutes per mile), Parsons could have travelled that distance in about 17 minutes and arrived home by 11:39 p.m.

Given that the report contained inculpatory information, trial counsel made a reasonable decision not to pursue this line of inquiry. Moreover, trial counsel's decision did not prejudice Parsons because any exculpatory evidence about his alibi was of minimal probative value. *See*, *e.g.*, *Mills v. Scully*, 826 F.2d 1192, 1197 (2d Cir.1987) ("Weighing the advantages of cumulative impeachment evidence against the disadvantages of incriminating admissions and inconsistent versions of events, counsel's choice to avoid the grand jury testimony *in toto* appears well justified."); *see also Franza v. Stinson*, 58 F. Supp.2d 124, 156 (S.D.N.Y. 1999) (collecting cases).

### 2.   Failure to Object to the Crime Scene Photographs and Victim's T-Shirt

According to Parsons, trial counsel should have objected to admission of certain crime scene photographs taken several days after the shooting on the basis that several witnesses testified that the actual light conditions were darker on the night of the shooting. With regard to the blood-soaked t-shirt worn by the victim when he was shot, Parsons asserts that trial counsel should have objected to its admission on the basis that the medical examiner's office did not have the opportunity to examine it for gunshot residue. Both of these arguments go to the weight that should be accorded to these items of evidence, not to their admissibility. Therefore, an objection to their introduction into evidence would not have been successful. *See People v. Diendere*, 167 A.D.3d 413, 414 (1st Dep't 2018) ("The court providently exercised its discretion in receiving photographs depicting the eyewitness's view of the assault. While, as the jury was well aware, the

photos were taken under different lighting conditions from those existing at the time of the assault, those differences went to weight rather than admissibility[.]") (citation omitted).

"'The failure of a lawyer to invoke meritless objections cannot constitute constitutionally deficient performance.'" *Parks v. Sheahan*, 104 F. Supp. 3d 271, 285 (E.D.N.Y. 2015) (quoting *Hicks v. Ercole*, 09–CV–2531, 2015 WL 1266800, at *23 (S.D.N.Y. Mar. 18, 2015) (citing *United States v. Regalado*, 518 F.3d 143, 150 n. 3 (2d Cir. 2008)). "Similarly, 'counsel [does] not render ineffective assistance by failing to make [an objection that would have been overruled as baseless].'" *Id.* (quoting *Johnson v. Rivera*, 07–CV334, 2010 WL 1257923, at *9 (N.D.N.Y. Mar. 25, 2010) (citing *United States v. DiPaolo*, 804 F.2d 225, 234 (2d Cir.1986); alterations in original).

Because any objection to the admission of these items of evidence would have been overruled, it was not unreasonable for trial counsel to decide not to object, and Parsons was not prejudiced by the lack of objection. *See Castellano v. United States*, 795 F. Supp.2d 272, 279–80 (S.D.N.Y. 2011) (holding that trial counsel was not ineffective, in prosecution for murder, racketeering, and robbery, in failing to pursue issue of prosecutor's alleged coaching of witness outside courtroom in connection with her identification of defendant; any improper coaching went to weight of witness's testimony, not admissibility, and there was no likelihood that additional efforts on that line of inquiry would have altered result of trial).

### 3. Failure to Impeach Hall Regarding His Allegedly Incorrect Statement About Petitioner's Tattoo

Parsons asserts that trial counsel should have impeached Hall with a police report stating that Hall had informed the officers that the murder suspect had a tattoo of the word, "Prince," on his arm. As Respondent points out, there is no evidence in the record,

apart from Parsons' self-serving assertion, that Parsons did not have such a tattoo. Therefore, there was no basis on which to impeach Hall.

In any event, as was the case with Investigator Dominic and Investigator Sullivan's report, the report at issue here contained information unhelpful to the defense insofar as it showed the consistency between Hall's statements to the police immediately after the incident and his trial testimony. Moreover, although the second page of the report appears to be missing from the copy submitted by Parsons on appeal, SR.348, it references the photo array procedure conducted by Investigators Dominic and Sullivan, during which Hall readily identified Parsons as the shooter, SR.345.  Trial counsel did not make an unreasonable strategic decision in forgoing this line of questioning since it would have exposed the defense case to the introduction of inculpatory evidence. *See, e.g., Speringo v. McLaughlin*, 202 F. Supp.2d 178, 192 (S.D.N.Y. 2002) (trial counsel was not ineffective in failing to order a comparison of third parties' fingerprints with those found on a gun, because without a specific identification of the fingerprints, counsel was afforded maximum leeway to argue that other persons fired the gun; strategy of keeping the maximum amount of flexibility for argument, and insulating the defense theory from potentially inculpatory information, was reasonable).

## VII.    Ground 4: *Batson* Violation

Parsons reasserts the *Batson* claim that he raised on direct appeal. The Appellate Division rejected it, finding that "[t]he prosecutor provided race-neutral reasons for exercising peremptory challenges with respect to two African-American prospective jurors, and County Court properly determined that those stated reasons were not pretextual[.]"  *Parsons*, 13 A.D.3d at 1099-100 (citation omitted). The Appellate Division's

ruling is an adjudication on the merits subject to the limitations on relief set forth in § 2254(d).

### A.  Law Relevant to Ground 4

In *Batson*, the Supreme Court held that the Fourteenth Amendment's Equal Protection Clause prohibits state prosecutors from exercising race-based peremptory challenges. *Batson*, 476 U.S. at 89. Trial courts perform a three-step inquiry when ruling on a *Batson* objection to a peremptory strike:

> First, a defendant must make a *prima facie* showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008) (internal quotation marks and alterations omitted).

The trial court's "finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is 'entitled to "great deference[.]"'" *Davis v. Ayala*, 576 U.S. 257, 135 S. Ct. 2187, 2199 (2015) ("*Ayala*") (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (*per curiam*) (quoting *Batson*, 476 U.S. at 98, n.21)). Section 2254(d)(2) of AEDPA demands a showing that the trial court "unreasonabl[y] determin[ed] the facts in light of the evidence presented in the State court proceeding." *Id.* (quoting 28 U.S.C. § 2254(d)(2)). Moreover, under AEDPA, "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338–39 (2006) (quoting 28 U.S.C. § 2254(e)(1)).

### B.  Analysis of Ground 4

There is no suggestion that either the trial court or the Appellate Division acted unreasonably or contrary to clearly established federal law in recognizing and applying *Batson*'s burden-shifting framework. The only disputed issue is the reasonableness of trial court's factual determination at step three of the *Batson* inquiry regarding the prosecutor's credibility. *See Rice*, 546 U.S. at 342. In such case, the proper question for the habeas court is "whether the trial [court]'s finding rested on 'an unreasonable determination of the facts,' 28 U.S.C. § 2254(d)(2), i.e., 'if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge,'" *Johnson v. Gonyea*, 752 F. App'x 14, 17 (2d Cir. 2018) (unpublished opn.) (quoting *Rice*, 546 U.S. at 338), *cert. denied*, 139 S. Ct. 2669 (2019). As discussed further below, the Court finds that it was not.

The two prospective jurors at issue, Tisdale and Fair, were both African-American. During the first round of peremptory challenges, which was conducted off the record, the prosecutor exercised at least three peremptories to excuse both of these individuals as well as prospective juror Masters, who was not in a minority group. Tr.197, 199. When the proceedings resumed on the record, the following colloquy occurred:

> [TRIAL COUNSEL]: I have a *Batson* challenge regarding [the prosecutor]'s peremptory challenges to number 3, Miss Tisdale, and number 4, Mr. Fair. They are the first two black members of the panel available in this pass. Both of them indicated they could certainly be fair. Miss Tisdale indicated she can be open minded about all the circumstances, and Mr. Fair indicated he has testified before, and he'll be willing to be fair.
>
> [PROSECUTOR]: I will start with Mr. Fair if that's okay. Mr. Fair's son was convicted by our office of Criminal Possession of Stolen Property, I believe, in the fourth. He's also indicated that he has a friend who he's visited in the correctional facility recently. Based upon those particular instances, the People are using a peremptory. In addition, Miss Tisdale also has had family members or relatives convicted of crimes, and those are the basic reasons for both of them and, also visited someone recently in the correctional

facility indicating that she has other friends who have been convicted of crimes.

THE COURT: You want to be heard any further?

[TRIAL COUNESL]: We have a white juror who indicated they have been both to correctional facilities, as well as individuals who have been convicted of crimes and he hasn't bumped any of those.
[PROSECUTOR]: If I may, I bumped Mr. Masters, number 7, who had two friends convicted of robbery. It's exactly the same reason, and I bumped him.

THE COURT: I believe there has been race neutral reasons extended and, therefore, I will allow the challenges.

Tr.197–99.

Parsons asserts that the prosecutor's reasons for excusing Tisdale and Fair were pretextual because (1) they were the only two African-Americans on the first panel, and he is African-American; (2) Tisdale did not "have a pro-defense bias" because she had one family member who was a police officer, which would lead to the inference that she had a pro-prosecution bias; and (3) although both Tisdale and Fair had "close" relatives who had been convicted of crimes, and both visited people who were in prison, "neither . . . indicated that these facts would suggest a pro defense bias." Pet. at 36–38; *see also* SR.146–55.

Respondent disputes Parsons' assertion that Tisdale and Fair were the only African-Americans in the entire first panel of prospective jurors, stating that the record does not establish this fact. *See* Resp. Mem. at 67. Nonetheless, even assuming they were, that does not compel the Court to find that a *Batson* error occurred. *See Ayala*, 135 S. Ct. at 2193–94 (prosecution's use of peremptories to strike all of the African–Americans and Hispanics who were available for service did not, in and of itself, establish a *Batson* violation).

The two reasons offered by the prosecutor for striking Tisdale and Fair were well-founded in the record, and the trial court did not unreasonably credit the prosecutor's reliance on them. The Court turns first to the fact, cited by the prosecutor, that both Tisdale and Fair had close relatives convicted of felonies. Tisdale related that her male cousin had pleaded guilty to "a couple of drug charges and a gun charge," and at the time of Parsons' trial, had been "in prison going on, like, five years." Tr.125–27. Tisdale's cousin had been prosecuted by the same office prosecuting Parsons. *Id.* Moreover, the crimes to which her cousin had pleaded guilty involved guns and drugs and thus shared some similarities with the events underlying the murder charge against Parsons. *See id.*

Fair indicated that three years earlier, his son had pleaded guilty in Yates County to grand larceny for stealing guns and had been sentenced to five years' probation as a first offender. Tr.127–30. Fair did not believe his son knew about the stolen guns but just happened to be riding in the car from which the police recovered the guns. Tr.128–29.

Courts in this Circuit "have consistently found that the arrest or prosecution of relatives of a juror is a valid reason for a peremptory challenge." *McCall v. Rivera*, 965 F. Supp.2d 311, 329 (S.D.N.Y. 2013) (citing *Huggins v. Girdick*, No. 03-CV-3248(NG)(VVP), 2007 WL 433397, at *12 (E.D.N.Y. Feb. 7, 2007) ("[T]he authority in th[e Second] [C]ircuit is overwhelmingly clear that race or gender-neutral explanations based on the fact that a relative of a prospective juror had been arrested or convicted of a crime, is acceptable under *Batson*."); *Green v. Travis*, 414 F.3d 288, 300–01 (2d. Cir. 2005) (upholding peremptory strikes as race-neutral based on the prosecutor's explanation that the prospective jurors had relatives who had been convicted of drug offenses); *Barbara v. Goord*, No. 98–CV4569, 2001 WL 1776159, at *6 (E.D.N.Y. Dec. 27, 2001) ("Prosecutors

routinely challenge [jurors whose family members had been recently prosecuted by the authorities], regardless of race, fearing bias against the authorities.")); *see also Crenshaw v. Sup't of Five Points Corr. Fac.*, 372 F. Supp.2d 361, 372 (W.D.N.Y. 2005) (finding that habeas petitioner did not fulfill burden under third *Batson* step where prosecutor offered as race-neutral reason fact that prospective juror's brother had been convicted of a felony) (collecting cases).

That Tisdale and Fair provided assurances of their ability to be fair and impartial does not necessarily invalidate the prosecutor's reasoning as pretextual.  *See Rice*, 546 U.S. at 341 ("That the prosecutor claimed to hold such concerns despite Juror 16's voir dire averments [that she could be impartial] does not establish that she offered a pretext. It is not unreasonable to believe the prosecutor remained worried that a young person with few ties to the community might be less willing than an older, more permanent resident to impose a lengthy sentence for possessing a small amount of a controlled substance."). While Parsons maintains that the prosecutor's explanations were pretextual because Tisdale and Fair stated that they could be impartial, the trial court "credited the *bona fides* of the [prosecutor]'s reasoning" and "found that it did not see purposeful discrimination." *McCall*, 965 F. Supp.2d at 329. Because Parsons "has not presented any other evidence suggesting that the prosecutor's strikes were pretextual, he has not presented sufficient evidence to overcome the state court's factual finding regarding the prosecutor's motivations for challenging the jurors." *Id.* (citations omitted).

Parsons also contends that the prosecutor's first reason for striking Tisdale and Fair should not be believed because he allegedly "outright lied," Pet. at 37, to the trial court by stating that he had struck prospective juror Masters on the basis he had friends

who had been convicted of robbery, Tr.199, when in fact, those friends had been robbery victims, Tr.117–18. As Respondent notes, Parsons' argument inverts the Supreme Court's precedent, which states that "[i]f a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise-similar non[minority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) (citation omitted). Here, the non-minority prospective juror, Masters, was not permitted to serve. And, the proffered reason did not actually apply to Masters. In other words, the non-minority excused juror did not share the relevant trait (i.e., a close relative or friend convicted of a crime) with the excused African-American jurors. Thus, the set of facts presented here does not "tend[ ] to prove purposeful discrimination[,]" *Miller-El*, 545 U.S. at 241.

The Court turns next to the other reason offered by the prosecutor for striking Tisdale and Fair—they had visited people who were incarcerated. Tisdale stated that she had gone to a prison to "visit a cousin," Tr.171, while Fair mentioned that he gone to a prison to "visit someone." *Id.* This is a race-neutral reason for exercising a peremptory strike. *See Graham v. Harrington*, No. SACV 11-00443 R SS, 2013 WL 4052559, at *15 (C.D. Cal. Aug. 9, 2013) ("'The prosecutor explained that she struck P.W. because P.W. visited her grandson in prison and the prosecutor was "uncomfortable with anyone who has been on the inside of a prison[,]' . . . which is a race-neutral rationale for the peremptory strike.") (citing, *inter alia*, *United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir. 1987) (striking prospective juror who had a brother in prison was "a neutral, reasonable basis for challenging [a] black juror[ ]"), *overruled on other grounds,*

*Huddleston v. United States*, 485 U.S. 681 (1988)); *United States v. Hendrix*, 509 F.3d 362, 370 (7th Cir.2007) ("The prosecution explained that Jurors Woodland, Hairston, and Strock all had relatives in prison, which is a valid and race-neutral basis for the strikes. Jurors with relatives in prison may sympathize with a defendant, or have feelings of animosity against the prosecution.")), *aff'd*, 590 F. App'x 714 (9th Cir. 2015).

It is true there were three other non-minority jurors who had visited prisons. Two of them, Rockey and O'Brien, were stricken for other reasons; Juror Turner was seated. The Second Circuit has explained that "[t]he relative plausibility or implausibility of each explanation for a particular challenge, assessed in light of the prosecution's acceptance of jurors with similar circumstances, may strengthen or weaken the assessment of the prosecution's explanation as to other challenges and thereby assist the fact-finder in determining overall intent.'" *Jordan*, 293 F.3d at 594. However, courts in this Circuit have found that "any inference of discrimination based on the single shared characteristic can be undermined by other differences between the jurors." *Wells v. Ricks*, No. 07 CIV.6982CM AJP, 2008 WL 506294, at *30 (S.D.N.Y. Feb. 26, 2008) (finding no pretext where prosecutor testified that juror's "hostile and unsettling demeanor was the primary reason for striking her, a trait not shared by the other [non-minority jurors who shared a trait with her]") (citations omitted), *report and recommendation adopted*, No. 07 CIV.6982 CM (AJP), 2008 WL 2986503 (S.D.N.Y. Aug. 1, 2008).

Here, the reasons for visiting a prison given by prospective juror Rockey and O'Brien were qualitatively different from those given by Tisdale and Fair. Rockey had gone on a school field trip to a prison, while Tisdale and Fair's answers indicated that they had visited a person with whom they had a personal relationship. Although O'Brien also

had visited a relative (his uncle), that person happened to be the prison warden. Tr.171. In contrast, the reasonable inference from Tisdale's response is that the cousin she visited was the cousin who had been convicted of drug and gun crimes. While Fair's answer was vague—he simply said he was visiting "someone"—it would not have been unreasonable to infer that he was visiting a prisoner.

There also were differences between Tisdale and Fair, who were stricken, and Juror Turner, who was seated. Juror Turner stated that a couple weeks before jury selection, she had accompanied her cousin to visit her cousin's son in prison. Tr.172. She did not indicate the nature of her cousin's son's offense or the office that prosecuted him. *Id.* When the jury pool was asked whether "any of you or anyone close to you has ever been arrested, accused of or convicted of the commission of a crime[,]" Tr.119, Turner did not respond affirmatively, in contrast to Fair and Tisdale. As noted above, Tisdale and Fair both had relatives who had been convicted of crimes—a cousin and a son, respectively. "Thus, while the white jurors were somewhat similarly situated," *Davidson v. Cunningham*, No. 16-CV-01125 (JFB), 2017 WL 3738560, at *16 (E.D.N.Y. Aug. 29, 2017), "'the prosecutor had put forward other reasons, in addition to the trait shared with the unchallenged jurors,'" *id.* (quoting *United States v. Alvarado*, 951 F.2d 22, 25 (2d Cir. 1991)), "to establish that 'the principal difference between them' was not race." *Id.* (quoting *United States v. Thomas*, 320 F.3d 315, 318 (2d Cir. 2003)).

Finally, Parsons contends that the reason for striking Tisdale was pretextual because she did not "have a pro-defense bias" but instead had a "pro-prosecution bias" inasmuch as she had one family member who was a police investigator. However, questioning revealed that that she did not "see him very often," did not know what

department he was with or what type of work he did, and, in any event, did not "discuss his work with him at all." Tr.91. As discussed above, Tisdale had a cousin whom she visited in prison, and she also admitted she was familiar with someone who "uses illicit drugs." Tr.167. Based on her answers, it was not unreasonable for the prosecutor to conclude that Tisdale was less close to the police investigator than she was to the incarcerated cousin and the person who used illicit drugs, and thus any potential pro-prosecution bias was more likely to be weaker than any pro-defense bias.

On an independent review of the record, the Court finds no convincing reason, and Parsons has provided none, to question the trial court's conclusion regarding the race-neutral reasons offered by the prosecutor for exercising peremptory strikes against Tisdale and Fair. Even assuming that the trial court "had reason to question the prosecutor's credibility regarding" the reasons given for striking Tisdale and Fair, "[t]hat does not . . . compel the conclusion that the trial court had no permissible alternative but to reject the prosecutor's race-neutral justifications and conclude [Parsons] had shown a *Batson* violation." *Rice*, 546 U.S. at 341. The fact that "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility . . . does not suffice [on habeas review] to supersede the trial court's credibility determination." *Id.* at 341–42; *accord Ayala*, 135 S. Ct. at 2201. Because Parsons has not shown that the *Batson* ruling was an unreasonable determination of the facts in light of the evidence presented, 28 U.S.C. § 2254(d)(2), he is not entitled to habeas relief on this claim. *See Rice*, 546 U.S. at 341–42; *Ayala*, 135 S. Ct. at 2201.

### VIII.   Ground 6: Verdict Unsupported by Legally Sufficient Evidence

In support of Ground 6, Parsons asserts, as he did in his *pro se* appellate brief, that the conviction was not based on legally insufficient evidence because it rested on perjured testimony by Hall and the other eyewitnesses and because the prosecution's witnesses' gave testimony that was inaccurate, internally inconsistent and lacking in credibility. *See* Pet., Ground 6; SR.266–78. The Appellate Division rejected Parsons' claim that the evidence was legally insufficient, finding that while he "presented alibi witnesses, four eyewitnesses to the shooting testified for the People that defendant shot the victim multiple times, at short range." *Parsons*, 13 A.D.3d 1100 (citation omitted). The Appellate Division's holding constitutes an adjudication on the merits subject to the limitations on relief in 28 U.S.C. § 2254(d).

### A.  Law Relevant to Ground 6

The "clearly established" federal law with regard to legal insufficiency claims is *Jackson v. Virginia*, 443 U.S. 309 (1979). In that case, the Supreme Court held that evidence is legally sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). The Supreme Court has "made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (*per curiam*). "First, on direct appeal, 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.'" *Id.* (quotation

omitted). "[S]econd, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was '"objectively unreasonable."'" *Id.* (quotations omitted)).

The legal insufficiency "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n. 16. "Proving the defendant's identity as the perpetrator of the alleged crime beyond a reasonable doubt is a necessary element of conviction for every crime." *United States v. Ward*, No. 5:06CR35-V, 2008 WL 2485587, at *1 (W.D.N.C. June 17, 2008) (citing *Butler v. United States*, 317 F.2d 249, 254 (8th Cir.1963) ("The authorities dealing with the general subject of identification of the accused, and particularly with the quantum and quality of proof required to establish this element of a criminal case, uniformly hold that proof of the identity of the person who committed the offense is essential to a conviction.")). Identity was the only element of the offense at issue in Parsons' prosecution.

In their case-in-chief, the prosecution put forth testimony from four eyewitnesses— Hall, Latacha, Beans, and Crowley—identifying Parsons as the shooter. In addition, Officer Correia testified that Wright made an excited utterance identifying Parsons as the person who shot him. The Second Circuit has held that "'the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.'" *United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004) (quoting *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979)). Moreover, "[i]t is well settled that where . . . the government's case is based primarily on eyewitness testimony describing criminal

activity, 'any lack of corroboration goes only to the weight of the evidence, not to its sufficiency. The weight is a matter for argument to the jury, not a ground for reversal on appeal.'" *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir.1997) (quoting *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989)). "Thus, even without corroborating evidence, eyewitness testimony, which was presented here, generally constitutes legally sufficient evidence." *Cole v. Rock*, No. 12-CV-6587 NSR PED, 2013 WL 5323733, at *12 (S.D.N.Y. Sept. 20, 2013).

Parsons counters that all four eyewitnesses to the shooting conspired to testify falsely; the eyewitness testimony regarding the number of shots fired was contradicted by expert testimony that only five shots were fired and that the victim sustained only two gunshot wounds inflicted from the back; the eyewitnesses "admitted to perjury and lying" in the grand jury and in their police statements; the eyewitnesses admitted to being "either drunk and/or high on crack cocaine" at the time of the shooting; Officer Correia's testimony regarding the victim's excited utterance was contradicted by Lashay Harris, one of the emergency medical technicians, who testified that she heard no such statement by the victim; and the alibi witness, Langen, testified that Parsons entered his residence at 10:00 p.m. and left at 12:00 a.m.

To the extent that Parsons argues that all the eyewitnesses admitted to lying about their identifications of him as the shooter, this argument improperly relies on Hall's recantation, which did not come into existence until years after the trial. It is well settled that "[l]egal sufficiency goes only to evidence at trial, not subsequent evidence" such as "newly discovered evidence." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) ("*Jackson* does not extend to nonrecord evidence, including newly discovered evidence.").

Parsons' remaining arguments are directed solely to the credibility of the eyewitnesses and Officer Correia and alleged inconsistences in the evidence they provided. "Questions of witness credibility belong to the fact-finder," and the arguments Parsons made on direct appeal and makes here "were already presented to, and resolved by the jury at his trial." *Moye v. Corcoran*, 668 F. Supp.2d 523, 539 (W.D.N.Y. 2009) (citing *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal."); collecting cases); *see also Perkins v. Comm'r of Corr. Servs.*, 218 F. App'x 24, 26 (2d Cir. 2007) (unpublished opn.) ("Perkins's challenge to sufficiency centers on the reliability and credibility of the sole eyewitness to the crime. Assuming that eyewitness testimony has been properly admitted, its credibility is for the jury.").

Furthermore, a reviewing court's "recitation of inconsistencies in the testimony," *McDaniel v. Brown*, 558 U.S. 120, 133 (2010), would simply demonstrate that court's "fail[ure]" to "review the evidence in the light most favorable to the prosecution," *id.*, contrary to the Supreme Court's directive in *Jackson*. To find in Parsons' favor on his legal insufficiency claim which would require the Court to engage in impermissible "fine-grained factual parsing" of the proof which *Jackson* does not permit. *Johnson*, 566 U.S. at 655. The Court accordingly concludes that Parsons has not demonstrated that the Appellate Division's rejection of his legal insufficiency claim was an incorrect application of federal law, much less an unreasonable one.

Finally, the Court rejects Parsons' attempt to submit a weight of the evidence claim under the guise of a legal insufficiency argument. A weight of the evidence claim involves only a matter of state law and thus is not cognizable on federal habeas review. *McKinnon*

*v. Sup't, Great Meadow Corr. Fac.*, 422 F. App'x 69, 75 (2d Cir. 2011) (unpublished opn.) ("[T]he argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus, and as a matter of federal constitutional law a jury's verdict may only be overturned if the evidence is insufficient to permit any rational juror to find guilt beyond a reasonable doubt.") (internal and other citations omitted).

## IX.    Ground 9: Pre-Trial Counsel's Conflict of Interest

### A.  Background Relevant to Ground 9

On the first day of trial testimony, the prosecutor mentioned that Funk, who represented Parsons for two days prior to indictment, had represented Beans, one of the People's eyewitnesses. However, the prosecutor stated, Funk would not be appearing at trial on Beans' behalf. Tr.335, 341–42. On the basis of this fact, Parsons asserted on direct appeal that his Sixth Amendment right to counsel was violated because Funk had a conflict of interest. *See* SR.263–64. The Appellate Division summarily rejected this claim as without merit. *Parsons*, 13 A.D.3d at 1100 (rejecting "remaining contentions" as "without merit"). This ruling was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent regarding the Sixth Amendment right to conflict-free counsel.

### B.  Law Relevant to Ground 9

The Sixth Amendment right to counsel attaches during "the initiation of adversary judicial criminal proceedings," *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 198 (2008) (internal quotation marks omitted), and it guarantees the assistance of counsel during all "critical stages," *id.* "Where a constitutional right to counsel exists, [the Supreme Court's]

Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981) (citations omitted). "The burden of proof rest[s] on [the defendant] to show a conflict of interest by a preponderance of the evidence." *Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000) (citing *Harned v. Henderson*, 588 F.2d 12, 22 (2d Cir. 1978)).

### C.  Analysis of Ground 9

Parsons has not established the suggestion of a conflict of interest on Funk's part. Notably, there is no evidence that Funk represented Beans at any point in time *prior to or during* Funk's two-day, pre-grand jury representation of Parsons.

Parsons nevertheless asserts that Funk's representation at trial of Beans, while Parsons was represented by an entirely different attorney, prejudiced his defense because Funk "join[ed] the People, represent[ing] a prosecution witness." SR.264. This is pure speculation since Beans testified, and the prosecutor confirmed, that no agreement existed between them with regard to Beans' testimony. Tr.537, 547–48. Parsons alludes to the possibility that Funk may have shared certain information with Beans that Funk learned from his pre-trial representation of Parsons. Again, this is utter conjecture. The Second Circuit has cautioned that "it is not enough in determining the existence of an actual conflict of interest merely to assess the attorney's state of mind"; rather, there must exist some "objective basis for the claim." *Strouse v. Leonardo*, 928 F.2d 548, 553 (2d Cir. 1991). An objective basis is clearly absent in this case. *See, e.g.,* *Scott v. Racette*, No. 1:15-CV-00043-MAT, 2018 WL 451825, at *9 (W.D.N.Y. Jan. 17, 2018) (finding objective basis for conflict of interest "clearly lacking" where petitioner asserted that trial counsel had "divided loyalty" due to his "prior familiarity" with the arson

victim and, out of his concern for victim's daughter, falsely informed petitioner that his state habeas corpus petition for bail could not be appealed), *certificate of appealability denied*, No. 18-495, 2018 WL 4030599 (2d Cir. June 28, 2018).

## X.    Ground 10: Ineffective Assistance of Appellate Counsel

Parsons asserts that the assistant public defender from the Monroe County Office of the Public Defender ("Public Defender") assigned to represent him on direct appeal was ineffective for failing to argue that (1) trial counsel was ineffective for failing to excuse Juror Heath for cause, *see* Pet., Ground 10(A); and (2) the trial court erroneously denied trial counsel's motion for a mistrial following the outburst by a woman who identified herself as Wright's mother, *see id.* Ground 10(B). In addition, Parsons contends that the Public Defenders Officer should not have handled his appeal because it represented one of Wright's family members and thus had a conflict of interest. *See* Pet., Ground 10(C).

Parsons raised all three claims in his application for a writ of error *coram nobis* filed in the Appellate Division. That court summarily denied *coram nobis* relief without explanation. This ruling was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent regarding the Sixth Amendment right to effective appellate counsel.

### A.  Law Relevant to Ground 10

"Although the *Strickland* test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citations omitted).  "[I]t is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that

could be made." *Id.* (citation omitted).  "To establish prejudice in the appellate context, a petitioner must demonstrate that 'there was a "reasonable probability" that [his] claim would have been successful before the [state's highest court].'" *Id.* at 534 (quoting *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992) (footnote omitted in original; brackets in original)).

### B. Analysis of Ground 10

#### 1. Failure to Excuse Juror Heath

Juror Heath was in the first *voir dire* panel. When the trial judge inquired as to the prospective jurors' exposure to information about the case, Juror Heath stated that he remembered reading about the case six months ago, but the only detail he could remember was the name "Wright." Tr.75, 82–86. When asked if reading this article would affect his ability to be impartial, Juror Heath replied, "The only – I just – I wondered why he did the crime, why this person was adduced [sic] of the crime or why the crime was committed. That's – I'm wondering that, something to do with it, but I don't think that would make me impartial." Tr.84. Juror Heath repeatedly assured the trial court that he could be fair and impartial. *Id.* When the prosecutor asked whether Juror Heath believed Parsons committed the crime, he answered no and explained he had simply wondered why someone would commit that crime – "why it was committed." Tr.84-85. Trial counsel then obtained Juror Heath's assurance that he would follow the trial court's instructions about the presumption of innocence and the burden of proof. Tr.86. Neither side moved to excuse Juror Heath. Tr.197–200, 308.

The Second Circuit has characterized trial strategy and *voir dire* as "inseparable," *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002), noting that whether to seat a

particular juror is a "paradigmatically strategic" decision. *Ciaprazi v. Senkowski*, 151 F. App'x 62, 63-64 (2d Cir. 2005) (unpublished opn.). Here, counsel actively participated in *voir dire* and asserted a *Batson* challenge. Rather than suggesting a lapse by trial counsel, the record supports the conclusion that the decision to seat Juror Heath was part of a reasonable strategic approach to selecting a jury. *See Figueroa v. Heath*, 10-CV-0121, 2011 WL 1838781, at *11 (E.D.N.Y. May 13, 2011) ("[C]ounsel's active participation in *voir dire* indicates that any decisions to challenge (or not to challenge) jurors were made as part of a reasonable trial strategy, rather than as a result of counsel's failure to provide effective assistance.").

Parsons has offered nothing to overcome the "strong" presumption that the decision to seat Juror Heath was "made . . . in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Given that Parsons has not established a meritorious claim of ineffectiveness of trial counsel, he cannot show that he was prejudiced by appellate counsel's decision not to raise such a claim on direct appeal. *See*, *e.g.*, *Person v. Ercole*, No. 08 CIV. 7532 LAP DF, 2015 WL 4393070, at *28 (S.D.N.Y. July 16, 2015) ("The fact that the underlying federal claim lacks merit also means that Petitioner suffered no prejudice from appellate counsel's failure to raise it in the context of an ineffective-assistance-of-trial-counsel claim, as Petitioner cannot show that such a claim would have had any likelihood of success.") (citing *Aparicio v. Artuz*, 269 F.3d 78, 100 (2d Cir. 2001)).

### 2. Failure to Argue that Trial Court Erroneously Denied Mistrial

During cross-examination, Hall refused to answer a particular question, prompting an unidentified spectator to exclaim, "He could plead the Fifth." Tr.377. The trial court

immediately directed Hall to step down and put the jury in recess. *Id.* After the jurors left the courtroom, the trial court attempted to identify the person who made the remark; a woman who said she was the victim's mother admitted she had done so. Tr.377–78. The trial court had her escorted out of the courtroom; as she was leaving, she said, "[Y]ou can tell the murderer that killed my son to stop smiling at me. You should have had that too, you coward. He's a coward. That's why you shot my son, that's because he's a coward." Tr.378.

When court reconvened about 15 minutes later, *id.*, the trial court expressed concerns that because the woman had become "quite hysterical and [was] screaming in the courtroom," "it would be necessary at this point to *voir dire* the jurors who are in the jury room, not far away from the audience area where the woman was seated, to see whether or not they heard anything, and if they did, whether or not that would affect them at this stage of the proceedings." Tr.378–80. Trial counsel moved for a mistrial, asserting his belief that the spectator's comments were directed at Parsons; in the alternative, he requested "individual *voir dire* of the jurors regarding the circumstances." Tr.380–81. The trial court reserved decision on the mistrial motion but stated it would "individually *voir dire*" the jurors. Tr.381.

The trial court's *voir dire* consisted of asking each juror and alternates whether they had heard anything after they had left the courtroom; whether the jurors had discussed what they had heard; and whether that would affect their determination in this case. The court did not mention that the spectator had identified herself as the victim's mother. Tr.381–97. The trial court found that, based on the *voir dire*, "there was very consistent – fourteen different individuals who indicated that some of them may have

heard some noises or voices, but everybody was very specific that they did not hear any specific words. In addition, [they said] that that would not affect them in any way." Tr.397. The trial court accordingly denied the mistrial motion. *Id.*

"[B]oth state and federal law are clear that the decision regarding whether to declare a mistrial lies within the sound discretion of the trial court." *Robinson v. Artus*, 664 F. Supp.2d 247, 265 (W.D.N.Y. 2009) (citing *Arizona v. Washington*, 434 U.S. 497, 510–11 (1978) (stating that a trial court's determination of whether to declare a mistrial is accorded "the highest degree of respect"); *People v. Testa*, 61 N.Y.2d 1008, 1009 (1984)). Denials of mistrial motions have been upheld in cases involving witness or spectator outbursts that were actually heard by the jury and were arguably more prejudicial and inflammatory than the one here. *See*, *e.g.*, *People v. Butler*, 214 A.D.2d 1014, 1014–15 (4th Dep't 1995) (after lengthy and probing cross-examination regarding the details of the defendant's alleged rape of complainant in her home, complainant called defense counsel "asshole" and threatened to "punch him in the nose;" complainant then ran from the witness stand and burst out crying in the presence of the jury; appellate court held that trial court did not abuse its discretion in denying the mistrial motion and its failure to give a *sua sponte* curative instruction was not error); *see also People v. Harp*, 20 A.D.3d 672, 673 (3d Dep't 2005) (finding no abuse of discretion in denial of defendant's motion for a mistrial based upon the emotional outbursts on three occasions by his older stepdaughter and alleged victim of sexual abuse in the presence of the jury and her audible cries as she left the courtroom).

There is no reasonable probability that, on the facts of this case, a claim asserting that the trial court abused its discretion in denying a mistrial would have been successful.

Accordingly, Parsons was not prejudiced by appellate counsel's decision not to raise such a claim on direct appeal.

### 3.  Conflict of Interest on the Part of Appellate Counsel's Office

Parsons was represented on appeal by an attorney with the Public Defender. According to Parsons, that office should not have handled his appeal because it previously represented one of the victim's family members and thus had a conflict of interest. Pet. Ground 10(C); SR.439–42. Parsons contends that appellate counsel was ineffective for failing to raise this claim on direct appeal.

As an initial matter, this conflict of interest claim also lacks any factual basis and cannot provide a basis for relief. *See Strouse*, 928 F.2d at 553. Even assuming there were facts suggesting a conflict of interest, they are clearly outside of the record, making the claim inappropriate for presentation on direct appeal. *Pierotti v. Walsh*, 834 F.3d 171, 179 (2d Cir. 2016) (because ineffective assistance of counsel "claim ultimately turn[ed] on facts appearing outside the record," "the Appellate Division could not have adjudicated [it] claim on direct appeal"). Parsons was not prejudiced by appellate counsel's failure to raise a claim that would have been summarily denied because it relied on matters outside the record. *See Perez v. Cully*, No. 1:13-CV-01107 (MAT), 2017 WL 1510660, at *5 (W.D.N.Y. Apr. 27, 2017) (appellate counsel not ineffective for failing to raise issue involving petitioner's alleged desire to testify before the grand jury because it was "not record-based and therefore could not have been brought on direct appeal") (citations omitted).

**CONCLUSION**

For the foregoing reasons, the request for a writ of habeas corpus is denied, and the Amended Petition (ECF No. 23) is dismissed. Because Petitioner has failed to make a substantial showing of the denial of a constitutional right, *see* 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.  Leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure. The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

DATED:      May 21, 2020
            Rochester, New York

CHARLES J. SIRAGUSA
United States District Judge